STERLING MORTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86517. Promulgated December 2, 1938.

*Robert V. Jones, Esq.*, for the petitioner.
*Carroll Walker, Esq.*, for the respondent.

OPINION.

KERN: This proceeding involves that part of a deficiency of $2,159.05 determined by respondent in petitioner's income tax liability for the year 1932 which arises by reason of (1) respondent's disallowance of a deduction claimed by petitioner in the sum of $848.32, representing interest paid by him on an obligation of the Twelve-Sixty Astor Street Building Syndicate, (2) respondent's disallowance of a deduction taken by petitioner in the sum of $3,625, representing an investment in common stock of the First Investors Co. of Illinois and claimed by him to have become worthless in that year, and (3) the disallowance by respondent of a deduction claimed by petitioner in the sum of $65,000, representing an investment by him in the 1242 Lake Shore Drive Syndicate and alleged to have become worthless in 1932.

The facts as to the first issue have been stipulated by the parties. With regard to the second, and third issues, part of the facts have been stipulated. A deposition has been introduced with reference to the second issue, and at the hearing of this proceeding evidence was offered with regard to the third issue which the parties agreed should also apply to a similar issue in Docket No. 91705.

The findings of fact and opinion as to each issue are set out separately.

### Issue No. 1.

In the year 1930 the taxpayer became associated with a small group of persons who were interested in the erection of a cooperative apartment building at 1260 Astor Street, Chicago, Illinois. These persons formed a syndicate under the name of, and did business as, the 1260 Astor Street Building Syndicate. During the year 1930 this syndicate caused to be organized the 1260 Astor Street Building Corporation and caused to be conveyed thereto title to real estate at 1260 Astor Street, Chicago. Prior to its incorporation subscriptions were received for a part of the corporation's stock by prospective tenants of the building. The organization of the company, and its leasing of apartments, was in the form commonly used in Chicago at that time in the erection of cooperative apartments. The financial plan of the enterprise, as originally formulated by the syndicate, called for a first mortgage of approximately one-half of the cost of the building, with the balance of the cost to be financed by the payments on the stock subscriptions.

Difficulty was encountered, however, in securing subscriptions to all of the company's stock; and stock representing five apartments remained unsold. Thereupon, the National Realty & Investment Co. (whose subsidiary, the Ouilmette Construction & Engineering Co.,

was given the contract for the construction of the building) offered to lend to the syndicate enough money to complete the financial program, upon condition that the stock of the building company to be formed be pledged as security for the loan and the proceeds of all apartments sold be used for repayment.

This offer was accepted, and a total of $170,000 was lent by National Realty & Investment Co. Under the agreement put in evidence by which the syndicate was created, Louis C. Sudler was appointed syndicate manager, and executed, pursuant to the powers given him as such, promissory notes payable to the National Realty & Investment Co. representing the amounts borrowed by the syndicate. Each of the notes was in the ordinary form of promissory notes and was signed "1260 Astor Street Building Syndicate, by Louis C. Sudler, By Syndicate Manager"; the second occurrence of "By" being evidently an error.

The cash received from the National Realty & Investment Co. was employed in the purchase of stock in 1260 Astor Street Building Corporation. This stock was pledged as collateral security for the promissory notes given to the National Realty & Investment Co. In 1931 the 1260 Astor Street Building Syndicate sold a portion of this stock (and the right to a lease to one of the apartments in the building, the right accompanying the stock under the cooperative plan) for $85,000. This amount was paid on the principal of the promissory notes, leaving an unpaid balance throughout the year 1932 of $85,000.

During the year 1932 the petitioner paid $848.32 on account of his proportionate share of the interest due from the syndicate on the unpaid balance of the promissory notes. This sum was paid by the petitioner to the 1260 Astor Street Building Corporation, which, in turn, transmitted the money to the National Realty & Investment Co. All the members of the syndicate made their payments of interest on the loan in similar fashion through the 1260 Astor Street Building Corporation.

Petitioner claimed a deduction on account of interest paid in this amount pursuant to section 23 (b) of the Revenue Act of 1932, set out in the margin.[1] This deduction was disallowed by respondent on the ground that the interest was an expense chargeable to the

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness except (1) on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this title, or (2) on indebtedness incurred or continued in connection with the purchasing or carrying of an annuity.

syndicate, and, since this particular syndicate was held by respondent to be taxable as a corporation, the interest paid by petitioner might not be deducted by him. In his brief respondent further contends that this payment of interest by petitioner represented an additional cost of the unsold stock held by the syndicate, and therefore was not deductible.

We shall assume, as both parties seem to have assumed, that the syndicate involved in this case should be considered as being classified for the purposes of the Revenue Act of 1932 as a corporation.

Section 23 (b) of the act, which we have quoted, plainly and categorically grants a deduction from gross income as to "all interest paid or accrued within the taxable year on indebtedness", with two specific exceptions not pertinent to this case. We have held that "indebtedness" means "something owed in money which one is unconditionally obligated or bound to pay, the payment of which is enforceable." *William Park*, 38 B. T. A. 1118; *W. S. Gilman*, 18 B. T. A. 1277; affd., 53 Fed. (2d) 47. The question of whether there is an enforceable obligation to pay so as to constitute an indebtedness within the meaning of this section depends for its solution on the law of the state having jurisdiction. *William Park*, *supra*. Since the notes upon which interest was paid by the petitioner were executed in Illinois and were to be paid in Illinois, and the parties to the notes lived in Illinois, it is obvious that the law of Illinois must determine whether the interest due upon the notes was an indebtedness of petitioner. Under the laws of that state, if a note is executed on behalf of a syndicate by the syndicate manager pursuant to the authority granted to him by the syndicate agreement, each member of the syndicate is liable on the note as a primary obligation and if the note is unpaid as to principal or interest the payee may enforce payment against the individual members of the syndicate. *Slater* v. *Clark*, 68 Ill. App. 433. The Illinois law in this respect is in accord with the common law rule universally recognized. 33 C. J. 873.

Since the interest paid by petitioner and claimed by him as a deduction under section 23 (b) was interest paid by him on an indebtedness, for which he was primarily liable, it necessarily results that the disallowance of this deduction by respondent was erroneous, unless the granting of this deduction is so limited by other provisions of the act as to make it unavailable to the petitioner.

Respondent contends that, since the syndicate should be considered as an association taxable as a corporation, it must be considered as a corporation for all purposes in any case arising under the revenue act. For this broad proposition respondent cites *Burk-Waggoner Oil Association* v. *Commissioner*, 269 U. S. 110. That case held that Con-

gress had the power to classify an association as a corporation with regard to the imposition of a tax upon the income of the association even though, according to the laws of the state in which it was organized, held property, and conducted its business, it was a partnership. In the opinion the following language was used: "It is true that Congress cannot convert into a corporation an organization which, by the law of its state, is deemed to be a partnership. But nothing in the Constitution precludes Congress from taxing as a corporation an association which, although unincorporated, transacts its business as if it were incorporated."

In *Pierce Oil Corporation*, 32 B. T. A. 403, 429, we held that, where an association which was taxable as a corporation completely liquidated and its sole shareholder received its assets in lieu of its certificates, this gave rise to gain measured by the difference between the investment in the certificates and the actual value of the liquidated assets taxable to its shareholder. As to the gain arising from this transaction between the association and its shareholder, we held that the shareholder was taxable in the same way as he would have been had he been a shareholder of a corporation. That this was within the intent of Congress was indicated by section 201 (a) of the Act of 1921, cited by us, to the effect that the term dividend "means (1) any distribution made by a corporation * * * to its shareholders *or members.*" The holding in the *Pierce Oil Corporation* case may be authority for the proposition that in a transaction between an association and its members gain or loss should be computed in the same way as in a transaction between a corporation and its stockholders, but it is not authority for the proposition that in all cases arising under the revenue act an indebtedness incurred by an association to persons other than its members must be considered as an indebtedness of a corporation upon which its members are not personally liable, when the fact is that as to such indebtedness it is not a corporation, is not liable thereon, and can not even be sued for the indebtedness, the primary obligation, in truth the sole enforceable obligation as to the indebtedness, being on the members of the association. We are not disposed to extend the doctrine of *Burk-Waggoner Oil Association* v. *Commissioner, supra,* to this result.

To classify an association for income tax purposes as a corporation has been held properly within the powers of Congress, and this classification has been extended to cases involving the taxation of distributions made by the association to its members; but to carry this classification to the extent of denying that members of an association are personally liable on obligations of the association for the reason that they are to be considered as stockholders of a corporation protected by the cloak of a nonexistent corporate entity is to accomplish

a legal metamorphosis which would be in direct conflict with the language of the Supreme Court in *Burk-Waggoner Oil Association*, *supra*, which we have quoted.

The argument that the indebtedness of the members of the association, although a primary obligation, was incurred for the benefit of the association, and therefore should be treated as a capital contribution by stockholders to a corporation, is predicated upon an assumption that the association will be regarded in the situation present in this case as a corporation. As we have indicated above, an association will be considered as a corporation for the purposes of computing the tax upon its income or upon income received by its members resulting from transactions between them and the association, cf. *Pierce Oil Corporation*, *supra*, but will not be considered as a corporation in a consideration of the facts of this case, and therefore, the argument fails.

It may further be argued that in the event the syndicate had received an income in the taxable year the interest upon the syndicate obligations might have been paid out of this income and the syndicate in its return might have claimed as a deduction the amount of the interest thus paid. While this may be a valid criticism of the symmetry of the act, it does not seem a valid or even a pertinent argument against the conclusion that, where the members of an association themselves pay interest on an indebtedness upon which they are individually and primarily liable, the payments thus made are properly deductible from their individual gross income pursuant to section 23 (b). Cf. dissenting opinion of Roberts, J., in *Helvering* v. *New York Trust Co.*, 292 U. S. 455; *McFeely* v. *Commissioner*, 296 U. S. 102.

The case of *Wood* v. *Rasquin*, 21 Fed. Supp. 211, relied upon by respondent is not in point, since the interest payments were made by a stockholder on behalf of a *de jure* corporation.

Upon this issue our decision is for petitioner.

*Issue No. 2.*

The second issue is whether or not the petitioner is entitled to a deduction of $3,625 from his gross income because of the worthlessness of an investment of that amount in the common stock of First Investors Co. of Illinois, an Illinois corporation. The petitioner contends that this common stock became worthless in 1932. The respondent has determined that the stock became worthless in 1931.

On July 1, 1929, the petitioner purchased 325 shares of common stock of the First Investors Co. of Illinois for $3,625. The petitioner also purchased certain shares of preferred stock in the same company. As to these shares of preferred stock, no question is here presented, since respondent has allowed a deduction in 1932 by reason of their

becoming worthless in that year. While the certificates of common and preferred stock are not in evidence, both parties have assumed in their arguments that the preferred stock was preferred over the common stock not only as to the payment of dividends but also as to any liquidation. The statement contained in the minutes of the investment advisory committee of the company dated March 27, 1930, to the effect that the common stock of the company, as of that date, was about $14,000 minus in value is consistent with this assumption. We shall, therefore, make the same assumption in our discussion.

First Investors Co. of Illinois was an investment trust of the management type. In 1930 or 1931 it organized as a subsidiary an investment company of the fixed type, known as Distributors Unified Service, Inc. As such an investment trust, the First Investors Co. of Illinois held and dealt in securities. It operated to a substantial extent upon borrowed money.

The decline in the market value of securities which began in 1929 affected the company, and on March 27, 1930, the value of the assets of the company was less than its current and preferred stock liability by $14,000. On November 14, 1930, its directors authorized the sale of sufficient securities to reduce the loan of the company with Sutro Bros. & Co. (one of the principal brokers of the company) to $210,000. The continued decline in the securities markets in 1931 made the sale of a substantial additional amount of the company's assets either necessary or desirable, and the book value of the investment inventory of the company accordingly diminished from $1,068,264 on September 30, 1930, to $598,764.46 on September 30, 1931, and to $106,257.61 on December 31, 1931. The current liabilities of the company were correspondingly reduced from $460,752.23 on September 30, 1930, to $16,670.86 on December 31, 1931. The book value of the assets, including investment inventory and accounts receivable, on December 31, 1931, was $144,896.66. On December 31, 1931, the investments of the corporation had a market value of $42,000. This valuation included a valuation of $25,000 for the investment of the First Investors Co. of Illinois in Distributors Unified Service, Inc. There is no evidence that the accounts receivable had any value. The liability of the company on its preferred stock outstanding on December 31, 1931, was the amount of $609,825.

The manager of the affairs of the First Investors Co. of Illinois was Kittredge Batchelder. First Investors Co. of Illinois had invested, prior to December 31, 1931, in excess of $25,000 in getting its subsidiary, Distributors Unified Service, Inc., under way, and "at the end of 1931 Batchelder informed the directors that he thought he was getting somewhere with his investment trust and that he felt that it had great possibilities."

No formal corporate action, either by the board of directors or by the stockholders, was at any time taken with respect to the sales of securities which were made during the year 1931, except to the extent, if any, that the corporate action above related on November 14, 1930, may have applied to any sales made in 1931.

The securities markets suffered a further decline in the year 1932. On June 22, 1932, the board of directors of First Investors Co. of Illinois authorized liquidation of the company. On July 16, 1932, the stockholders of First Investors Co. of Illinois ratified the act of the directors of June 22, 1932, and passed a resolution "that this corporation be and the same hereby is dissolved." On January 7, 1933, the board of directors adopted a further resolution for the payment of any further assets pro rata among certain remaining creditors of the corporation.

The petitioner deducted his investment in the common stock of this company as worthless in his income tax return for 1932.

The common stock of the First Investors Co. of Illinois did not become worthless in 1932.

Petitioner, in his income tax return for the year 1932, made a deduction from his gross income on the ground that it represented a loss which arose by reason of worthlessness of common stock owned by him in the First Investors Co. of Illinois, and was deductible under section 23 (e) of the Revenue Act of 1932, and article 174, of Regulations 77, which are set out in the margin.[2] This deduction was disallowed by respondent on the ground that the stock in question became worthless not in 1932, but in 1931.

The petitioner contends that the dissolution and liquidation of the corporation occurred in 1932 and, therefore, the loss was suffered in

---

[2] SEC. 23. (e) LOSSES BY INDIVIDUALS.—Subject to the limitations provided in subsection (r) of this section, in the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business; or

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or

(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return.

ART. 174. *Shrinkage in value of stocks.*—A person possessing stock of a corporation can not deduct from gross income any amount claimed as a loss merely on account of shrinkage in value of such stock through fluctuation of the market or otherwise. The loss allowable in such cases is that actually suffered when the stock is disposed of. If stock of a corporation becomes worthless, its cost or other basis as determined and adjusted under section 113 is deductible by the owner in the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness. Where banks or other corporations which are subject to supervision by Federal authorities (or by State authorities maintaining substantially equivalent standards) in obedience to the specific orders or general policy of such supervisory officers charge off stock as worthless, or write it down to a nominal value, such stock shall, in the absence of affirmative evidence clearly establishing the contrary, be presumed for income tax purposes to be worthless. For dealers in securities, see article 105. For limitations on deductions for losses from sales or exchanges of stocks and bonds generally, see article 272.

that year, since this action constituted an "identifiable event" fixing the loss. Respondent contends that, since he has determined that the stock became worthless in 1931, the petitioner, in order to show that it became worthless in 1932, must present substantial evidence that the stock in question had some value in 1931, which he can not do, and further, that the "identifiable event * * * can not be looked upon as the inevitable 'yardstick' in the decision of all * * * cases" involving losses predicated on worthless stock.

Since the opinion of the Supreme Court in *United States* v. *White Dental Manufacturing Co.*, 274 U. S. 398, there have been many opinions of the various Circuit Courts of Appeal, and of the Board, which have considered deductions claimed by reason of the worthlessness of stock which the taxpayer has not sold but continues to hold. Some of these cases decided by the Circuit Courts of Appeal are the following: *Gowen* v. *Commissioner*, 65 Fed. (2d) 923; *Squier* v. *Commissioner*, 68 Fed. (2d) 25; *Deeds* v. *Commissioner*, 47 Fed. (2d) 695; *Olds & Whipple, Inc.* v. *Commissioner*, 75 Fed. (2d) 272; *Benjamin* v. *Commissioner*, 70 Fed. (2d) 719; *Jarvis* v. *Heiner*, 39 Fed. (2d) 361; *De Loss* v. *Commissioner*, 28 Fed. (2d) 803; *Royal Packing Co.* v. *Commissioner*, 22 Fed. (2d) 536; *Rosing* v. *Corwin*, 88 Fed. (2d) 415.

From an examination of these cases it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock.

The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and

can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an "identifiable event" in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the stock, for already "its value had become finally extinct." *De Loss* v. *Commissioner*, *supra*, at 803. Cf. *Squier* v. *Commissioner*, *supra; Monmouth Plumbing Supply Co.* v. *United States*, 4 Fed. Supp. 349. In cases where the stock has concededly lost any liquidating value in a certain year, but an event occurs in a subsequent year which the taxpayer claims is "identifiable," and where the Commissioner of Internal Revenue has determined that stock became worthless in the year in which it lost its liquidating value, then the taxpayer, in order to be entitled to the loss deduction in the latter year, has the burden of proving that, although the stock lost its liquidating value in the prior year, it continued to have a potential value until the occurrence of the event. This we consider to be implicit in the rule stated in *Mark D. Eagleton*, 35 B. T. A. 551; affd., 97 Fed. (2d) 62, and *John J. Flynn*, 35 B. T. A. 1064. Cf. *William E. Steinback*, 30 B. T. A. 1252.

Applying these principles to the instant case, we find that petitioner's common stock apparently had no present value as early as the spring of 1930. During that year and in 1931 the greater part of its assets were sold in order to obtain funds with which to pay its most pressing obligations. The corporation carried its investments on its books at $1,068,264 on September 30, 1930, at $598,764.46 on September 30, 1931, and at $106,257.61 on December 31, 1931. Its liabilities, exclusive of stock liability, appeared as $460,752.23 on September 30, 1930, and $16,760.86 on December 31, 1931. Its preferred stock outstanding on the latter date was in the amount of $609,825. The securities which made up the investment account of the corporation, carried on its books at $106,257.61 as of December 31, 1931, were estimated by an officer of the company to have a value of $42,000 on that date. There is no evidence that any of the other assets of the corporation had any value. The investment of the

corporation in its subsidiary, Distributors Unified Service, Inc., was included in its investment account. The evidence, therefore, shows that the assets of the corporation on December 31, 1931, were worth $42,000, while its current liabilities were $16,670.86, and its outstanding preferred stock was carried as a liability, prior to any claim of petitioner's common stock, at $609,825. During the year 1931 the corporation was trading in securities which it owned, but operated at a loss. Without question the common stock of the corporation had no liquidating value on December 31, 1931.

Did it have a potential value on that date? The assets of the corporation consisted of securities subject to fluctuation, and the ownership of a subsidiary corporation organized to carry on the business of an investment trust of the fixed type which one of the officers of the corporation felt had great possibilities. There is nothing in the record, however, to indicate that any officer or directer of the corporation had a hope or expectation that a continued operation of the corporation would result in creating an equity for the holders of its common stock, much less that such a hope and expectation was reasonable under the circumstances. Petitioner has failed to prove that the common stock of the First Investors Co. of Illinois had either liquidating or potential value on December 31, 1931. Therefore, we must conclude that this stock did not become worthless in 1932. Accordingly, our decision is against petitioner on this issue.

## Issue No. 3.

In 1928 the petitioner with various other persons executed an agreement creating a syndicate known as the 1242 Lake Shore Drive Syndicate. Pursuant to the provisions of that agreement the petitioner paid $50,000 toward the capital of the syndicate during the year 1929. During the year 1930 the petitioner paid in an additional $15,000 to the capital of the syndicate.

The syndicate was formed for the purpose of promoting an apartment building upon property known as 1242 Lake Shore Drive, Chicago. The syndicate acquired the land and caused an apartment building to be erected thereon, all prior to the year 1932. The transaction was financed by a first mortgage of $850,000, and by money which was raised by the syndicate. Part of the syndicate money was in the form of the capital which the syndicate members contributed. Approximately $350,000 of additional money which was needed to complete the financing was raised by the syndicate through the medium of collateral notes which the syndicate managers issued, pursuant to authorization contained in the syndicate agreement.

The syndicate caused the property to be transferred to an Illinois corporation known as the 1242 Lake Shore Drive Building Corporation, and in return received 14,000 shares of the common stock of that

company, being its entire authorized stock, and proprietary leases to all apartments in the building, the building being designed for operation on the so-called cooperative plan. Thus, the corporation owned the building subject to a first mortgage of $850,000, and had 14,000 shares of common stock outstanding. The syndicate initially owned all these shares and pledged them all for securing the payment of its outstanding collateral notes. The program of the syndicate was to sell these shares, and the proprietary leases accompanying the same, at a profit. Prior to the year 1932 the syndicate had sold and disposed of 5,883 shares of the stock and had transferred the proprietary leases relating thereto to the purchasers. The remaining 8,117 shares of stock remained with the syndicate, being pledged upon its collateral notes.

The syndicate has not been able to dispose of any of the remaining apartments or of any of the remaining shares of stock since 1931, when the last sale thereof occurred; and, in fact, certain of the shares of stock and certain apartments have had to be taken back by the syndicate, so that today its holdings of stock in the corporation are larger than they were in 1932.

In 1932 there was no market for the sale of this stock and the syndicate could not have been liquidated so as to leave any amount for the syndicate subscribers. At no time since 1932 has it been possible to sell this stock and, therefore, to liquidate the syndicate in such fashion as to produce anything for the syndicate subscribers. It was impossible in 1932, and has been impossible at all times since that date, to rent the apartments to which the syndicate holds proprietary leases at sufficient rental to pay the assessments made on the apartments by the 1242 Lake Shore Drive Building Corporation. The consequence is that the syndicate has lost money and is substantially indebted to the 1242 Lake Shore Drive Building Corporation, which indebtedness is over and above the indebtedness of the syndicate upon the outstanding collateral notes.

The balance sheet of the syndicate at the close of business on December 31, 1932, discloses that a deficit existed amounting to $211,978.01, which was charged against the investment of $543,750 originally made in the syndicate by the members participating therein. The value of the syndicate's capital investment, as disclosed by the balance sheet, on December 31, 1932, was carried at $331,771.99.

The balance sheet of the syndicate at the close of business on December 31, 1933, shows a deficit of $224,093.68 and a net loss incurred for the year 1933 of $12,115.67. The value of the capital investment was reduced by the amount of the loss and carried on the balance sheet at $319,656.32.

The balance sheet at the close of business December 31, 1934, discloses a net loss for the year of $24,702.59, and the value of the capital investment was reduced to $294,953.73.

The petitioner's investment in the 1242 Lake Shore Drive Syndicate did not become worthless in the year 1932.

This issue involves the right of petitioner to deduct, as a loss under section 23 (e) of the Revenue Act of 1932, the amount of his investment in the 1242 Lake Shore Drive Syndicate. It is petitioner's contention that his investment became worthless in 1932. Respondent has determined, however, that the investment did not become worthless in that year, and has, accordingly, disallowed the deduction.

Attention is called to our discussion of the preceding issue.

The burden of proving that the Commissioner's determination was wrong being on petitioner, he must prove that the investment became worthless in 1932. In order to do this, he must show that his investment represented by a proportionate part of the stock held by the syndicate in the 1242 Lake Shore Drive Building Corporation had neither liquidating nor potential value. The evidence tends to show that during the year 1932 the investment had no liquidating value, since there was no market for the sale of the stock of the investment corporation, and a liquidation at that time would have resulted in a complete loss. However, the corporation continued in business and the syndicate holding the greater part of its stock continued to operate. The balance sheets of the syndicate for the years 1932, 1933, and 1934 showed operating losses, but they also showed a substantial equity for the investment. It may be that petitioner has only proved an absence of market value of his investment, but certainly it is clear that petitioner has not proved that his investment was without potential value in 1932, and on this issue our decision is for respondent.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

BLACK, dissenting: I dissent from the views expressed in the majority opinion as to issue No. 3. I think the facts show that petitioner has proved his loss of investment in the 1242 Lake Shore Drive Syndicate to all reasonable extent and purpose and should be allowed this loss in a computation of his net income for 1932. That he will ever recover anything from this investment seems to me so remote and improbable that it should not be the basis of disallowing the loss which petitioner claims.