William G. Maguire v. Commissioner.
Maguire v. Commissioner
Docket No. 112570.
United States Tax Court
1943 Tax Ct. Memo LEXIS 66; 2 T.C.M. (CCH) 968; T.C.M. (RIA) 43471; October 29, 1943
*66 John F. Hughes, Esq., 305 Broadway, New York, N. Y., for the petitioner. Francis S. Gettle, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves an income tax deficiency for the year 1940 in the sum of $5,170.16. The only question in controversy is whether the capital stock of the Tunnel & Mine Machinery Company became worthless in 1940. The petitioner is an individual and filed his income tax return for the year 1940 with the collector of internal revenue at Richmond, Virginia. A stipulation of facts was supplemented by certain oral testimony and exhibits. Findings of Fact The petitioner acquired by purchase 333 shares of the common stock and 50 shares of the preferred stock of the Tunnel & Mine Machinery Company at a total cost of $26,235.30 during a period between December 31, 1928 and May 27, 1930. The Tunnel & Mine Machinery Company was incorporated in about 1923 under the laws of the State of New Jersey. Its business was the construction of tunnels, without using an "open-cut", for purposes of water supply, electric conduits, intercepting sewers, etc. It operated for several years under a license of the Sheen Patents, *67 but later it developed and improved upon the machinery and apparatus and secured its own patents covering the improvements. It organized a wholly owned subsidiary company, known as the Tunnel Building Company, which did the actual construction work. Tunnel & Mine Machinery Company then engaged in promoting and soliciting business for construction of such tunnels by the use of its equipment. In December 1933, Tunnel Mine & Machinery Company entered into a contract with the Link-Belt Company of Chicago, Illinois. It was agreed that the Link-Belt Company should purchase a four foot tunnel machine and block making apparatus for $12,000; should construct all additional machinery and equipment up to 8 inches in diameter; that such equipment should be leased to contractors and that the royalties received from such leases were to be applied to the cost of construction, and the balance to be applied as follows: 20 per cent to Tunnel & Mine Machinery Company for promotion and selling expenses and the balance to be divided 55 per cent to Tunnel & Mine Machinery Company and 45 per cent to Link-Belt Company. The contract was to run for the life of any patent licensed to the Link-Belt Company. *68 Pursuant to this agreement, Link-Belt Company did lease the equipment to various contractors on a royalty basis. The royalties received by Link-Belt Company were insufficient to cover the costs of manufacturing the equipment and no payments were made to Tunnel & Mine Machinery Company on account of royalties. On January 1, 1940 there was one actual construction job in operation at Hamilton Township, New Jersey. In the latter part of 1939 on this job the contractor encountered quicksand difficulties and the equipment failed. The contract was abandoned in June 1940 and new contractors completed the job by another method. The Tunnel & Mine Machinery Company maintained its own office and furniture at No. 211 South 16th Street, Philadelphia, Pennsylvania, until November 1940, when it abandoned its lease and sold its furniture. It was carrying on business up to October 1940 through its president and assistant secretary. The charter of the company was declared forfeited by the State of New Jersey in 1940 by reason of its arrears in franchise taxes. The Tunnel & Mine Machinery Company had no judgments against it, and no bankruptcy proceedings, either voluntary or involuntary, were instituted. *69 The comparative balance sheet for the periods ending December 31, 1939 and October 31, 1940 was as follows: Assets
October 31, 1940
December 31, 1939
Cash
(59.08)
(48.25)
Tunnel Building Co
$ 20,000.00
$ 20,000.00
Tunnel Building Co.h55,234.23
55,234.23
A. W. Warner
39,200.00
39,200.00
a/c Receivable - Miami Job
1,154.78
1,154.78
Machinery
309,894.47
309,894.47
Office Furniture & Fixtures
176.02
176.02
Patents
103,333.00
103,333.00
Organization Expense
750.00
750.00
Total
$529,683.42
$529,694.25
Liabilities
Notes Payable - Dickerman
$ 2,000.00
$ 2,000.00
a/c Payable S. P. Curtis
44,541.31
43,926.61
Link Belt - Advance
15,000.00
15,000.00
Profit Sharing Notes to Stockholders
37,725.00
37,725.00
Capital Stock
Common
466,730.00
466,730.00
Preferred
100,000.00
100,000.00
Surplus Deficit
(136,312.89)
(135,687.36)
Total
$529,683.42
$529,694.25
The expenses of the corporation and the loss sustained for the years 1936 to 1940, inclusive, were as follows: 1936
1937
1938
1939
1940
Income
None
None
None
None
None
Deductions: Rent
$ 560.04
$ 560.04
$ 560.04
$ 466.70
$286.68
Taxes
88.00
520.44
452.04
45.20
14.10
Salaries and Wages
350.00
594.00
594.00
544.50
195.75
Selling Expense
179.45
135.00
General Expense
280.04
340.94
322.22
179.20
131.35
Interest
79.99
75.89
Total Deductions
$1,457.53
$2,095.41
$2,004.19
$1,370.60
$627.88
Net Loss
$1,457.53
$2,095.41
$2,004.19
$1,370.60
$627.88
*70 Samuel P. Curtis, a mechanical engineer, was a stockholder, director and president of Tunnel & Mine Machinery Company during its entire existence. During the years 1936 to 1940 he had advanced his own funds to cover operating expenses. During the year 1940 he was actively engaged in soliciting and estimating various definite and actual prospects for securing, on behalf of the corporation, large contracts in various cities. The capital stock of the Tunnel & Mine Machinery Company became worthless in the year 1940. Opinion The sole question is whether the petitioner sustained a loss in the year 1940 by reason of the worthlessness of his stock holdings in the Tunnel Mine & Machinery Company. Section 23 (e) of the Internal Revenue Code provides that in computing net income, in the case of an individual, there shall be allowed as deductions losses sustained during the taxable year not compensated for by insurance or otherwise, "if incurred in any 23 (g) limits the loss to the extent provided transaction entered into for profit." Section by section 117 of the Code. The pertinent provisions of the Code and the Treasury Regulations are set forth in the footnote.[1] There are numerous *71 decisions construing the application of these provisions. We need only refer to the ultimate principles established by them. The problem always is the determination of the "fact" as to when the loss was sustained. Brown v. Commissioner, 94 Fed. (2d) 101; Jones v. Commissioner, 103 Fed. (2d) 681. In the case of stock, that is the time the stock became worthless. *72 The respondent has determined that the capital stock here involved did not become worthless in 1940. This determination is presumptively correct. Welch v. Helvering, 290 U.S. 111; Wickwire v. Reinecke, 275 U.S. 101. It is the taxpayer's burden to satisfactorily establish that the worthlessness occurred in the year the loss is taken. Harry H. DeLoss, 6 B.T.A. 784; affd., 28 Fed. (2d) 803; cert. denied, 279 U.S. 840; Gowen v. Commissioner, 65 Fed. (2d) 923. The test is usually met by pointing to some identifiable event, or events, which establishes worthlessness within the contemplation of the taxing provisions. Jones v. Commissioner, supra. Various identifiable events have been recognized by the courts as indicative of the time of worthlessness. We need not summarize them here. We are concerned only as to whether the facts here shown establish that the stock became worthless in the year 1940. The corporate balance sheet, as of October 31, 1940, shows assets of $529,683.42 *73 and liabilities, exclusive of capital stock, of $99,266.31. The capital stock liability amounted to $566,730, leaving a surplus deficit, of $136,312.89. The respondent furnishes us a breakdown of the assets. The $20,000 item represents stock of a wholly owned subsidiary, Tunnel Building Company. This latter company was not a successful operating company. The item of $55,234.23 represents a loss on contracts sustained by Tunnel Building Company. The item of $309,894.47 consists principally of development and engineering expenses charged to machinery account and did not represent actual machines on hand. The item $103,333 represents principally development expenses on patents. The condition of the balance sheet did not improve subsequent to December 31, 1936. These facts, divorced from the surrounding circumstances, are quite persuasive that the assets had little realizable value long prior to 1940. However, we do not think certain facts can be isolated from the picture as a whole. Other factors must be considered in determining "worthlessness" within the meaning and spirit of the revenue provisions. There is no dispute that the corporation continued to function until voluntary dissolution *74 in 1940. At least one contract was in operation in 1940, although it eventually proved financially unsuccessful. The president, and moving spirit, who had invested approximately $350,000 in the venture had various negotiations in 1939 and 1940 for prospective contracts which, if they had materialized, would have made the company successful. The consummation of some of the prospective contracts was delayed due to the intervening war and other factors. The president, who had such a large stake invested, and whose testimony was frank and impressive, was encouraged and hopeful that the years of experiment, effort, and the expenditure of large amounts might return their fruit. In view of the nature of this company's business we can not say that this optimism was not based on realities. The human element inherent in the term "hope" is not capable of precise measurement. In the despair of one is often found the inspiration of another. We are not justified here in substituting our judgment for that of those who have devoted years of their time and expended large amounts of money in the business as to the proper time the enterprise should be abandoned. In the absence of such identifiable events, *75 as bankruptcy, receivership, actual cessation, etc., we, as triers of the fact, ought not to be harsh in judging the wisdom of those charged with the responsibility of guiding an enterprise on behalf of its investors. The business of this corporation was the development and exploitation of patented machinery. Hope and despair are inherent elements in such enterprise. If successful, profits are abundant; if unsuccessful, losses are relatively large. Even though it be assumed the stock had no actual value prior to 1940, we believe it had "potential" value until the project was abandoned in 1940 for lack of further funds. Sterling Morton, 38 B.T.A. 1270. The abandonment of operation was an identifiable event sufficient and proper to mark the date of worthlessness. D. C. Jackling, 9 B.T.A. 312; Milton H. Bickley, 1 B.T.A. 544. The respondent makes the point that the petitioner did not claim the loss in 1939 because it would have been of no avail in that year. No doubt, had he claimed the loss in 1939, the respondent would have denied it on the very basis now asserted that worthlessness occurred *76 even as far back as 1936. There is no evidence in the record indicative of the presence of a tax motive. Moreover, petitioner was merely a stockholder. He was not in control of the corporation's destiny and was in no position to maneuver the identifiable event for tax consequences. We find no merit in the suggestion of tax benefit. We hold that the petitioner has established that the capital stock of the Tunnel & Mine Machinery Company became worthless in 1940. The respondent erred in disallowing the deduction on the said stock to the extent claimed by the petitioner. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with a trade or business; or * * *
(G) Capital Losses. - (1) Limitation. Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117. REG 103, Sec. 19.23 (e)-1 Losses by Individuals. - * * *
In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. * * *↩