**TEXTRON, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 4072.**

United States District Court, D. Rhode Island.

June 7, 1976.

Morris B. Abram, Peter J. Rothenberg, of Paul, Weiss, Rifkind, Wharton & Garrison,

New York City, Edward F. Hindle, of Edwards & Angell, Providence, R. I., for plaintiff.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Jerome Fink, Acting Chief, Refund Trial Section No. 1, Dept. of Justice, Stephen J. Csontas, Trial Atty., Tax Division, Dept. of Justice, Washington, D. C., Lincoln C. Almond, U. S. Atty., Providence, R. I., for defendant.

## OPINION

DAY, Senior District Judge.

In this action the plaintiff seeks a refund of federal income taxes and interest paid by it on June 15, 1964 in the total amount of $3,706,028.03 for its 1959 taxable year [1] plus statutory interest thereon from the date of payment.

The parties submitted this action for determination upon an agreed statement of facts. Said stipulation established the following facts.

Early in 1956, a corporation which was in no way connected with Textron, Inc. (hereinafter Textron), and which was known as Hawaiian Steamship Co. Ltd. (hereinafter Steamship) purchased a former World War II troop ship, then called the LaGuardia, from the U. S. Maritime Administration for $3,850,438, and paid for it in large part by executing a large note secured by a first mortgage on the vessel in favor of the United States. The note provided that the sole recourse of the mortgagee would be limited to repossession of said vessel.

Under the terms of said mortgage, Steamship was required to recondition the LaGuardia to make it suitable for passenger service between the West Coast and the Hawaiian Islands. This was obviously a costly undertaking. Steamship needed financing. It approached Textron with a proposal that the latter finance said reconditioning.

After negotiations, the following arrangement was effectuated: Textron purchased said ship from Steamship at Steamship's actual cash cost and assumed the payment of said first mortgage held by the Maritime Commission. Textron also agreed to recondition said vessel and then to charter it to Steamship on a bareboat basis for fifteen (15) years for $100,000 per month (later increased to $110,000). Textron financed a part of said cost of reconditioning through a loan from the Bowery Savings Bank, secured by a second mortgage on said vessel that was insured by the Maritime Administration.

Steamship began to operate the reconditioned vessel—now renamed Leilani—in January, 1957; its maiden voyage through the Panama Canal was a well publicized fiasco from which the ship never recovered. By October, 1957, Steamship was not only three months in arrears in its payments to Textron for charter hire, but owed substantial amounts to other creditors such as suppliers of fuel and goods; on November 22, 1957, Textron repossessed the ship for non-payment of the charter hire.

Textron wanted to keep said ship in service so that a sale thereof might be arranged in the future. But Textron was faced with an immediate difficulty; under its corporate charter Textron's management doubted whether it could operate a ship without first obtaining the approval of its shareholders. Its management then made a decision to create a wholly owned subsidiary to operate the Leilani.

Accordingly, on November 29, 1957, Hawaiian Textron, Inc. (hereinafter Hawaiian Textron) was incorporated. Shortly thereafter, said corporation issued 1,000 shares of its stock to Textron for the sum of $200,000. It became Hawaiian Textron's sole stockholder. In addition, Textron loaned $600,-000 to Hawaiian Textron on its 6% note due December 1, 1967. On December 4, 1957, Textron chartered the Leilani to Hawaiian Textron on substantially the same terms as it had previously been chartered to Steamship.

---

1. Textron's 1959 taxable year ended on January 2, 1960, the Saturday closest to December 31, 1959.

Meanwhile, Textron continued to search for a buyer of the Leilani without success. Finally, on February 11, 1958, officials of Textron met with the Maritime Administration in Washington, D. C. At this meeting it was agreed that the operation of the Leilani would continue, but that title to the ship would be transferred to Hawaiian Textron. As consideration therefor, Hawaiian Textron issued additional shares of stock and a promissory note to Textron and agreed to assume Textron's various obligations on the ship, although the Maritime Administration insisted that Textron guarantee that all conditions of the "sole recourse" provisions of the mortgages would be met by Hawaiian Textron. As part of this agreement Textron advanced to Hawaiian Textron an additional sum of $589,843.32 in exchange for another promissory note of Hawaiian Textron.

Hawaiian Textron continued to operate the Leilani between the West Coast and Hawaii—but at a loss—and required additional financial assistance from Textron which, from time to time, advanced funds to its subsidiary as open account advances. The unpaid balance of these advances amounted to more than $1,500,000 by June 2, 1959. And in a further effort to make a profitable operation of the Leilani, the management of Hawaiian Textron chartered two additional vessels to provide more cargo capacity and greater frequency of voyages in the hope of increasing its business.

These efforts proved futile. Hawaiian Textron continued to lose money at an alarming rate. In August, 1958, the Maritime Administrator agreed to a moratorium on further payments of principal on said first mortgage by Hawaiian Textron for the remainder of 1958—but only after Hawaiian Textron agreed to waive the "sole recourse" provisions of said mortgage and thus assumed personal liability for any deficiency.

However, Hawaiian Textron's losses continued to increase and it was finally decided to put an end to the constant financial drain. On January 6, 1959, the Leilani was placed temporarily in dry dock; on January 9, 1959, it was tied up at a pier in Alameda, California.

Officers of Hawaiian Textron then undertook negotiations with the Maritime Administration and several potential purchasers of the Leilani, none of which resulted in the sale of said vessel. On May 11, 1959, the Maritime Administration which had previously satisfied the second mortgage pursuant to its insurance obligation, filed a notice of foreclosure of the Leilani under both mortgages in the United States District Court in San Francisco, California. The foreclosure was completed by the sale of the Leilani at an auction on June 2, 1959, resulting in a deficiency against Hawaiian Textron in the amount of $688,000.

After said foreclosure, Hawaiian Textron had no assets other than nominal cash, accounts receivable and office furniture. As of June 6, 1959, its total assets as shown on its books were $139,000 and its liabilities to creditors *other* than Textron amounted to $1,254,000 (including said mortgage deficiency of $688,000 which was ultimately settled in December, 1959 for the sum of $100,000). In addition, Hawaiian Textron owed Textron a total amount of $4,585,476.02 in unpaid debt and accrued interest.

This was the situation on June 2, 1959, the date of the foreclosure of said mortgage on the Leilani which deprived Hawaiian Textron of the capacity to conduct its business, to earn profits and recover from its hopeless insolvency.

As of June 2, 1959, Textron's total investment in Hawaiian Textron consisted of the following:

| | |
|---|---|
| Basis of Hawaiian Textron Stock | $ 1,259,714.67 |
| Basis of Hawaiian Textron notes, | 2,725,724.63 |
| Accrued and unpaid interest through June 2, 1959 | 213,374.61 |
| Open account advances through June 2, 1959 | 1,646,376.78 |
| Expenses paid on behalf of Hawaiian Textron | 85,000.00 |

Unamortized expenses in connection with investment in Leilani and Hawaiian Textron 41,541.47
 Total $ 5,971,732.16

At this point, all of this investment of nearly $6,000,000 was hopelessly lost. In view of this fact, Textron wrote off on its books its investment in Hawaiian Textron, declared its stock to be worthless and the debt owed to it uncollectible, and claimed appropriate deductions on its Federal income tax return for its 1959 taxable year.

After the mortgage deficiency of $688,-000 was settled for $100,000 at the end of 1959, Textron began to consider the possibility of future plans for Hawaiian Textron. As a preliminary step towards preparing Hawaiian Textron to enter into some new line of business, in February of 1960 Textron released Hawaiian Textron from all obligations it then owed to Textron.

By March, 1960, Textron believed it had located a favorable business opportunity for Hawaiian Textron. In late 1959, Textron had entered into an agreement to purchase Cleveland Pneumatic Industries, Inc. ("CPI"); at the time of the agreement it was contemplated that Textron would make the purchase either directly or through a subsidiary to be formed for that purpose. Textron assigned the contract to purchase CPI to Hawaiian Textron on March 9, 1960.

The CPI deal was not consummated. On April 4, 1960, the shareholders of CPI voted to reject the proposed acquisition.

In March of 1960, Textron also decided to acquire the assets of the Bell Defense Group from Bell Aircraft Corporation ("Bell") through a wholly owned subsidiary. A contract of sale was signed by Bell and Textron in April, 1960. On July 2, 1960, Hawaiian Textron (which had changed its name to Bell Aerospace Corporation) acquired the Bell Defense Group assets. This acquisition was made possible by a transfer of cash from Textron to Hawaiian Textron in the total amount of $16,500,000.

The new investment by Textron in its subsidiary, renamed Bell Aerospace Corporation, proved successful. Bell Aerospace made money. Pursuant to the provisions of section 172 of the Internal Revenue Code, Bell Aerospace claimed a deduction for its 1960 taxable year for the loss carryovers from prior taxable years incurred while its corporate name was Hawaiian Textron. Upon audit, however, the claimed net operating loss deduction was disallowed by the Internal Revenue Service in full in accordance with its view of the law at that time. Later, in 1963, the Internal Revenue Service issued Rev.Rul. 63–40, 1963–1 Cum.Bull. 41, in which it changed its prior position and announced that in the absence of a change in stock ownership, it would henceforth allow a corporation to use its own net operating loss carryover to offset the income of newly acquired business. Accordingly, the original disallowance of the Hawaiian Textron carryover was reversed and the deduction was allowed in the amount of $6,745,025.35. The carryover was then utilized in full by Bell Aerospace Corporation to offset its taxable income for its taxable years ending on December 3, 1960, December 2, 1961 and December 1, 1962.

As noted earlier herein, Textron had claimed deductions in its tax return for fiscal 1959—the year of Leilani's foreclosure—for its loss on its worthless stock and debt investments in Hawaiian Textron under sections 165(g) and 166 of the Internal Revenue Code. Those deductions claimed by Textron were disallowed by the Internal Revenue Service and Textron was assessed a deficiency amounting to $3,974,106.36 plus $768,799.03 as interest (of which $3,105,-300.72 of tax and $600,727.31 of interest related to the deductions at issue in this action). Textron paid these amounts on June 15, 1964 and filed a claim for a refund of $3,706,028.03 in taxes and interest with the Internal Revenue Service. After said claim was denied in full, Textron instituted this action in this Court to recover said overpaid taxes plus interest.

From the stipulation of facts submitted by the plaintiff and defendant it is established that the loss by Hawaiian Textron of the Leilani on June 2, 1959 left it as an insolvent company without any means with

which to conduct any business and to generate any income.

The issue before this Court is whether during the taxable year ended January 2, 1960 (Textron's taxable year) its stock in and debt owed to it by Hawaiian Textron had become worthless because said Hawaiian Textron was itself without any value.

■ The stock and long-term debt obligation of Hawaiian Textron were securities and were capital assets of Textron, since Textron was not a dealer in securities. Such stock and long-term debt were clearly within the provisions of Section 165(g)(1) of the Internal Revenue Code, 26 U.S.C.

Said Section provides as follows:

"(1) General rule—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset."

Clearly said section permits a taxpayer to take a deduction when stock owned by him in a corporation becomes worthless in the year for which he claims the deduction. *Boehm v. Commissioner*, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945); *Eagleton v. Commissioner*, 97 F.2d 62 (8th Cir. 1938). Although a worthless security loss is normally a capital loss, under section 165(g)(3), an ordinary loss is permitted to be taken if the security-holder is a domestic corporation owning a specified minimum percentage of the stock of the worthless corporation. Since Hawaiian Textron was at all times a wholly-owned subsidiary of Textron, the loss provision of said section 165(g)(3) clearly applies to this action.

■ In order to obtain a worthless stock deduction under said section it is not a necessary prerequisite that the corporation shall have been dissolved. See A. P. McGlynn, 4 B.T.A. 1005 (1926). But the stock must be wholly worthless. Partial worthlessness or a mere decline in value is not sufficient. Treas.Reg. § 165–4. And to fix the date of worthlessness the law generally requires some "identifiable event such

as the loss through foreclosure of the sole business asset with income producing potential which renders the stock not only worthless on the basis of current liquidating value, but valueless in terms of realistic future prospects, *United States v. S. S. White Dental Manufacturing Co.*, 274 U.S. 398, 46 S.Ct. 473, 70 L.Ed. 1133 (1927); *Keeney v. Commissioner*, 116 F.2d 401 (2d Cir. 1940). In order for the stock of a corporation to be worthless, the corporation must not only be insolvent but there must be no reasonable hope that the corporation's own resources could be effectively used to remedy the situation and restore value to its stock. *Steadman v. Commissioner*, 424 F.2d 1 (6th Cir.), *cert. denied*, 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970); *Sterling Morton*, 38 B.T.A. 1270 (1938), *aff'd*, 112 F.2d 320 (7th Cir. 1940).

The Internal Revenue Code in Section 166(a)(1) thereof which allows a taxpayer to take a deduction for a bad debt similarly provides as to bad debts:

"*Wholly Worthless Debts*—There shall be allowed as a deduction any debt which becomes worthless within the taxable year."

■ The issue before this Court is: did said stock and said debt held by Textron, become worthless at some time during the fiscal year 1959 for which the deductions were claimed by Textron. It is the financial condition of Hawaiian Textron during 1959 which is dispositive of this case since such deductions must be claimed when worthlessness first occurs or they will be lost forever. Stock or debt which is worthless at the beginning of a taxable year cannot become worthless during that year.

As to Hawaiian Textron, the reality in 1959 was hopeless. Having lost the Leilani by foreclosure on June 2, 1959—a classic identifiable event—Hawaiian Textron was clearly out of business; deeply in debt, it possessed no assets or resources which it could use to escape from its insolvency. The loans made to it by Textron were irretrievably lost and its stock, which was held solely by Textron, was equally without val-

ue as established by said agreed statements of facts.

In fact, the Government stipulated that both on June 2, 1959 and at the close of fiscal 1959 Hawaiian Textron possessed no liquidating value. The stipulated facts also establish that Hawaiian Textron possessed no "potential value" in the traditional sense; that is, it had no business assets and no other financial resources which could enable it to escape from its financial difficulties. Nevertheless, the defendant points out that Hawaiian Textron had lost substantial amounts of money in previous years and thus had substantial net operating loss carryovers which might permit it to apply such losses against subsequent earnings, if any, in future taxable years. From this situation it draws the conclusion that the stock and debt of Hawaiian Textron must have had *some* value and that this value, the amount of which it does not specify, precluded Textron from claiming deductions on the basis of the worthlessness of its investment. In advancing this contention, the Government overlooks the all important fact that Hawaiian Textron no longer had the assets and resources with which to generate earnings against which said operating loss carryovers might be applied.

Apparently the Government's only previous attempt to persuade a court to find value in potential carryovers was in *Becker v. United States*, 308 F.Supp. 555 (D.Neb. 1970), a case strikingly similar to this action.

In *Becker*, the taxpayers (a husband and wife) owned stock in a closely held corporation. The company had sustained a long series of losses; its liabilities exceeded its assets and in 1956 it had ceased to operate—though it had not been dissolved. In that year the taxpayers declared their stock worthless and claimed the appropriate deduction.

The Court found that the taxpayer was a man "well versed in business and familiar with the tax laws", 308 F.Supp. at page 555. Additionally, the Court noted "taxpayer admits that he was aware of the tax advantages of placing a new business within the corporate shell", and that "certain negotiations had occurred during 1956 in order to make use of the previous losses". But the Court in its opinion stated:

> "the evidence also shows however that as of the date that the plaintiff states the stock to be worthless, December 31st, 1956, there were no negotiations in progress nor were any *specifically* being contemplated. In short there was no business in sight although there *still remained a desire* to make use of the corporation in order to take advantage of the tax consequences." Id. at 555–56. (emphasis added).

In the summer of 1957, the year after the stock became worthless according to the taxpayer, the corporation did, in fact, acquire and operate a new business which proved profitable, allowing the prior losses to be used to offset income on the corporation's income tax return.

The Government contended that the existence of potential loss carryovers precluded the Court from finding that the stock had become worthless during 1956. The Court rejected the contention that loss carryovers can provide "value" where none otherwise exists. Recognizing that on the Government's theory no stock would really be worthless as every stock would have potential value, the Court held:

> "If this Court adopts the government's theory in this case every taxpayer, at least every taxpayer who has the control of a closely held corporation, knowledge of the tax advantages and a desire to utilize these advantages, will be unable to take a deduction for worthless securities. As stated before, under this theory the tax advantages to his holdings would prevent his declaring those holdings as worthless. This Court *does not believe, where the only evidence of some potential value remaining in a stock is carryforward losses and the knowledge and desire to utilize them, that the taxpayer should be prevented from declaring the stock worthless.*" Id. at 557 (emphasis added).

Since the Beckers' stock became worthless in 1956—regardless of its subsequent

resuscitation—the Court concluded that 1956 was the proper year to declare said stock to be worthless, and that judgment should be entered in favor of the taxpayers. No appeal was taken by the Government from that decision.

This case and Becker are strikingly similar. Like the plaintiffs in Becker, Textron was familiar "with the tax laws" and generally "aware of the tax advantages of placing a new business within a corporate shell". As in Becker, "there were no negotiations in progress nor were any specifically being contemplated" at the time of said foreclosure or prior to the close of the 1959 taxable year. It was not until March 9, 1960 that Hawaiian Textron received an assignment of the contract to purchase CPI and that proposed transaction was never consummated. Hawaiian Textron did not acquire the assets of the Bell Defense Group until July 2, 1960. Additionally, as in *Becker*, after the stock of Hawaiian Textron became worthless, Hawaiian Textron acquired a new business using funds contributed by Textron, its sole stockholder and the former's prior losses were used to offset its new income. In my opinion the logic of Becker is totally persuasive. As the Court held in that case—an insolvent corporation, unable to effect its own recovery, cannot be deemed "valuable" because of potential carryovers unless the traditional criteria of worthlessness are to be abandoned.

The Government contends that the possibility of loss carryovers gave value to the otherwise worthless stock of Hawaiian Textron. In view of its large negative net worth at the time in question whatever that "potential value" was, it had to exceed Hawaiian Textron's debts to third parties in order to establish that Textron's investment in Hawaiian Textron was not in fact worthless. "Some value" was not enough.

The usual method of proving value is to present evidence by way of expert testimony to establish the value of the property involved. The stipulation of facts in this case which was not disputed requires this Court to conclude that Textron's investment in Hawaiian Textron after the foreclosure of the Leilani was without any value. No evidence was presented by the Government to refute the facts as set forth in said stipulation or to establish the value of said loss carryover.

Section 172 of the Internal Revenue Code permits a taxpayer whose operations are unprofitable in one year to apply the losses of that year as a deduction against the income, if any, of the five (5) succeeding years. The carryover is simply a tax deduction which can reduce a taxpayer's future tax liability only if the taxpayer generates income in the following five (5) years. If there is no income in any of said five (5) years, there can be no benefit to the taxpayer from the carryovers. The generation of income requires assets and a business, neither of which Hawaiian Textron possessed. Hawaiian Textron lacked the capacity to derive any benefit from its substantial net operating loss carryovers. They were of no value to Hawaiian Textron.

Similarly, it cannot be said that the existence of said loss carryovers gave the stock and debt of Hawaiian Textron any market value. Under the tax laws, value means fair market value: "The price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts". Treas.Reg. § 20.2031–1(b). Under this test, the stock and debt of Hawaiian Textron could have had no value because no "willing buyer" would have paid anything for it, even taking into consideration said substantial net operating loss carryovers because any transfer of the stock would have automatically eliminated said loss carryovers.

Certain provisions of the Internal Revenue Code are designed to insure that net operating loss carryovers as such cannot be bought and sold. Sections 269 and 382(a) thereof have the effect of extinguishing the loss carryover of a corporation such as Hawaiian Textron which had no business at the time of the transfer of its stock to a

new owner. Since Hawaiian Textron had no business which could have been continued after a purchase of its stock, section 382(a) would have operated to extinguish the carryovers automatically upon any purchase of its stock. And since anyone acquiring such stock could have been motivated only by a desire to make use of Hawaiian Textron's net loss carryovers under the plain meaning of section 269 and the associated case law, the carryovers would have been disallowed after any acquisition other than a purchase falling within section 382(a).

It was therefore clear that Textron, the sole stockholder of Hawaiian Textron, could not realize anything from the carryovers by selling its stock in Hawaiian Textron to a third party because no third party could use said carryovers against the earnings of a new business.

As of 1959 there was substantial doubt that Hawaiian Textron could make use of its carryovers if it entered a new business, as it would be required to do in order to generate income and to benefit from the carryovers. The decisions in *Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957) and *Mill Ridge Coal Co. v. Patterson*, 264 F.2d 713 (5th Cir. 1959) had held that losses sustained in one business could not subsequently be used to offset the income of a different business. In 1959 it was thought that this rule might apply to a change of business even though there was no accompanying change of stock ownership. And Hawaiian Textron's net operating loss carryovers were in fact disallowed by the Internal Revenue Service upon its initial audit. They were finally allowed in 1963 when the Internal Revenue Service changed its position in Revenue Ruling 63–40, 1963–1, Cum.Bull. 46, which held that the doctrine stated in *Libson Shops* and *Mill Ridge Coal* would not be applied to the use by a single corporation of its own net operating loss carryovers against the income of a newly acquired business in the absence of any substantial intervening change of stock ownership.

There is another equally important factor which prevents any value from being assigned to these loss carryovers. Net operating loss carryovers, standing alone, are of no benefit to a taxpayer; they reduce the taxpayer's liability only if there is an income which they can offset. In 1959 neither Textron nor anyone else could know that Hawaiian Textron would in the future not only become a profitable enterprise, but would earn enough, and quickly enough, to use said loss carryovers.

The ultimate utilization of Hawaiian Textron's loss carryovers was contingent upon three events, viz: Textron's capacity and willingness to place new funds at risk; (2) the timely generation of profits by the new enterprise, and (3) the decision of the Internal Revenue Service or the Courts to permit the carryovers to be used against the profits of the new business. Each of these events occurred after 1959; none of them could have been predicted with any assurance as of 1959. Apparently, because of what happened after 1959, the Government contends that said loss carryovers had value in fiscal 1959 when Hawaiian Textron was insolvent and had no business and before Textron knew that the Bell business was for sale.

 It is to be remembered that the tax law treats each taxable year as a separate unit and requires that a deduction for a worthless security be claimed for the year in which said security becomes worthless without the benefit of hindsight. Thus the worthless stock and bad debt deductions must be considered from the perspective of fiscal 1959.

When loss carryovers are available, Congress intended that they be used, because it is not fair to tax profits which merely offset recently incurred losses. To suggest that a desire to make use of carryovers is somehow immoral or unethical is to challenge a policy established by Congress years ago, and affirmed repeatedly.

In short, Hawaiian Textron only claimed the deductions to which it believed it was entitled under the Code.

■ The Government suggests that, since Hawaiian Textron was ultimately permitted to use its loss carryovers, to permit Textron to take worthless stock and bad debt deductions would be tantamount to allowing a "double deduction" for the same loss. This contention is clearly lacking in merit. A corporation and its shareholders, however numerous they may be, are separate legal entities and separate taxable entities. Our system of taxation requires corporations to report the results of their operations on their tax returns and the shareholders to report the results of stockholdings on their separate tax returns.

In this context, the Government's claim of double deduction for the same loss is clearly without merit. Under our system of taxation Hawaiian Textron's operating loss and Textron's loss on its investment are entirely different losses. They are separate losses, separately incurred, by separate taxpayers. If Hawaiian Textron had operated at a profit, it would have been taxed on its income. If that profit then enabled Textron to sell the stock owned by it at a higher price, it would have been taxed on its gain. And certainly, if Textron had then complained of "double taxation" said contention would have been rejected by any Internal Revenue Service office or court, since it is conclusively settled that corporations and their stockholders are each separately taxed upon their respective separate incomes.

Apparently the Government would have this Court conclude that a system of taxation that exacts separate taxes from corporations and their stockholders when they are successful does not contemplate separate tax benefits for the same corporations and their stockholders when they are unsuccessful. It would be a strange notion of tax justice that provides for the taxation of each on the profits, but which does not provide deductions for each in the converse circumstances. And where there are two taxpayers, as here, double tax benefit is a basic element of our tax system.

No authorities have been cited to support its "double deduction" argument. The cases cited by the Government involve only one taxable entity claiming *two* deductions. This case involves *two* separate taxpayers claiming separate deductions for separate losses.

■ In my opinion, there is no merit in the Government's claim of double deduction. The fact that Hawaiian Textron had loss carryovers which it ultimately used cannot change the conclusion that under all traditional criteria the stock and debts of Hawaiian Textron were worthless following the foreclosure of the Leilani on June 2, 1959, and that Textron properly claimed deductions for its worthless stock in Hawaiian Textron and for the amount of the latter's indebtedness to it on its return for the fiscal year 1959. Said debt and said stock became and were clearly worthless in said year.

Accordingly, it is this Court's considered opinion that judgment should be entered in favor of the plaintiff in the sum of $3,706,028.03, plus interest at the statutory rate thereon from June 15, 1964. Counsel for the plaintiff will prepare and present for entry an appropriate judgment in conformity with the conclusions hereinbefore set forth.