PARIS G. SINGER and JANE E. SINGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent OSCAR S. GRAY and ELEANOR L. GRAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Singer v. Commissioner
Docket Nos. 8575-72, 8576-72.
United States Tax Court
T.C. Memo 1975-63; 1975 Tax Ct. Memo LEXIS 310; 34 T.C.M. (CCH) 337; T.C.M. (RIA) 750063; March 18, 1975, Filed K. Martin Worthy and Michael C. Durney, for the petitioners. JON @T. Flask, for the respondent. MEMORANDUM FINDINGS OF FACT AND OPINION For the calendar year 1969 the Commissioner determined deficiencies of $80,088.84 in the income tax of petitioners Paris G. and Jane E. Singer and $70,812.50 in the income tax of petitioners Oscar S. and Eleanor L. Gray. The following issues *311 remain to be decided: (1) Whether petitioners' stock in a certain corporation became worthless in 1969; (2) whether loans from petitioners to that corporation became worthless debts in 1969; and if so, whether the losses were business or non-business bad debts in the case of petitioners Singer; and (3) whether certain legal fees paid by the Singers in 1969 are deductible or must be capitalized. FINDINGS OF FACT The parties have filed a stipulation and supplemental stipulation of facts along with exhibits which are incorporated herein by this reference. Throughout the taxable year 1969 petitioners in each case, Paris G. Singer ("Singer") and Jane E. Singer in Docket No. 8575-72, and Oscar S. ("Gray") and Eleanor L. Gray in Docket No. 8576-72, were husband and wife. Both couples filed joint income tax returns for that year. At the time they filed their petitions herein they resided in Florida. Worthless stock and bad debts. From 1964 through 1971, Singer was engaged in the active practice of law in Fort Lauderdale, Florida. Initially he was associated with three other lawyers in an expense sharing arrangement, using the firm name of Andrews, Singer, Lubbers and Kilby. In 1967 *312 Kilby withdrew and the remaining members formed Andrews, Singer andLubbers, a partnership, in which profits were shared equally. The partnership was, in turn, succeeded by a professional association with the same name and three participants. During the summer of 1964, Vincent Welch, a lawyer practicing in Washington, D.C., who specialized in Federal Communications Commission ("FCC") matters, suggested to Singer and Lucille Frostman, a local realtor who was one of Singer's clients and social acquaintances, that they consider establishing a UHF television station in Fort Lauderdale. Singer was attracted to this idea, in part, by the prospect of the station as a client and also by the possibility that it would enhance his influence and reputation in the community. Pursuant to a Proposal dated November 30, 1964, and signed by Singer and Frostman as organizers, 11 investors, themselves included, subscribed to shares of the stock of Broward Broadcasting Company, Inc. ("Broward"), which was incorporated in Florida on December 17, 1964, for the purpose of establishing, owning and operating the proposed television station. The initial authorized capital of Broward consisted of 140,000 *313 shares of $1 par common stock, 126,000 shares of which were subscribed to by the 11 subscribers at par. Singer's share was 10 percent or 12,600 shares. Options to purchase onehalf of the remaining 14,000 shares at par were given to each of the two organizers, Singer and Frostman, and subsequently exercised. From the outset it became the practice to elect all of the stockholders to the board of directors. At this time Singer hoped that Broward's activities would generate about $30,000 each year in legal fees for his practice. The amounts actually billed, as set forth in the following table, fell short of his expectations: LEGAL FEES BILLED TO BROWARD BY SINGER
AND HIS FIRMS Year
Amount
1965
$ 605.57
1966
1,763.47
1967
6,883.84
1968 [1]/
19,327.25
1969
16,022.75
1970
5,398.50
50,001.38
Of the total amount billed, $25,715.58 was never paid. On January 20, 1965, Broward filed its application for a construction permit for a new commercial television broadcast station with the FCC, in which it anticipated *314 that the initial capital investment of $126,000, combined with a $200,000 loan from a commercial bank and advance purchases of time by advertisers of about $200,000, would be adequate to cover the cost of the broadcast facilities, estimated to be about $329,500. It was also anticipated that in the first year of operation revenues would exceed costs by about $30,000. Broward had no network affiliation and planned to operate as an independent station. On June 10, 1965, the FCC granted Broward a construction permit for a station with call letters WSMS-TV on the condition that it accept Channel 51 instead of Channel 39 which had been tentatively assigned to the Fort Lauderdale area at the time the company applied for its permit. The higher the channel, the more technical problems and sensitivity are encountered, and there is a loss of effectiveness. Broward in fact was to encounter various technical problems in broadcasting on Channel 51 in later years. At the combined stockholders and directors meeting on December 6, 1965, Singer, who was formerly assistant secretary, was elected president of Broward. He also retained his position as chairman of the executive committee. The shareholders *315 authorized an annual salary of $4,000 for the president, but it was never paid. Mr. Welch, who became FCC counsel and business advisor to Broward, informed its management in December of 1966, that an additional $360,000 in equity capital would be needed to go forward with construction of the station. During the next nine months the directors considered raising $500,000 by offering 100,000 shares of common stock for sale. People in brokerage firms and the television industry were solicited but without success. An impediment to raising such substantial additional capital -- in excess of the capital already committed by existing stockholders -- was an FCC prohibition against the transfer of control of the television station within three years after the existing stockholders had obtained operating authority. To make possible substantial equity investment by others in the station without losing their control over it the shareholders approved a recapitalization of Broward in 1967. The original authorized common stock was doubled to 280,000 shares, and an issue of 220,000 shares of a new Class A common stock with restricted voting rights was authorized. A prospectus was prepared, as of *316 November 6, 1967, to facilitate the private placement of 100,000 shares of the Class A stock at $6 per share, in minimum units of $40,000 each. It was estimated in the prospectus that the cost of station construction, equipment and preoperating expenses would be $865,000 and that an additional $100,000 would be necessary to cover the anticipated first year's operating deficit. Efforts to sell this stock were unsuccessful. A "package deal" was thereafter authorized by the directors on March 6, 1968, in which 25,000 units consisting of one share of common stock and two shares of Class A common stock would be offered at a unit price of $10. None were sold. (By the end of March, 1968, all of the original 140,000 shares of common stock had been fully paid for and issued at $1 per share.) The prospectus was then amended effective April 29, 1968, to provide for a similar package deal in larger blocks at a slightly lower price, which was also unsuccessful. By this time the projected start-up costs had risen to $940,000 plus an additional cash reserve of $210,000 to cover initial operating expenses. By August 1, 1968, two new investors were found, who together purchased 22,500 shares of *317 common stock and 32,500 shares of Class A stock at $1 per share, while some existing stockholders increased their investments by purchasing 33,060 additional shares of common at the same price. Later in August of 1968 the remaining 84,440 shares of authorized common stock were offered to the shareholders at $2 per share. All of the shares were subscribed and paid for by the end of November, 1968. On August 23, 1968, Broward entered into a conditional sale agreement with RCA whereby the company purchased television broadcasting equipment for a total price of $660,942, with $99,134 to be paid in cash before delivery, and the balance of $561,808 to be paid over a 60-month period, plus interest at the rate of 7.36 percent per year. The interest amounted to $41,348.40 and was to be prepaid (before payment of the principal) in 12 equal monthly installments of $3,445.70. Because of Broward's small net worth, RCA demanded personal guarantees to the extent of $350,000 of the deferred purchase price. Frostman and another shareholder refused to participate in such a guarantee. To expedite the transaction, Singer personally guaranteed the entire $350,000, with the understanding, never fulfilled, *318 that other shareholders would eventually join him in the guarantee. Among the many pieces of equipment purchased from RCA, some were used or older, less efficient models. To avoid confusion with a newly organized local radio station having a similar name, the shareholders changed Broward's name to "Gold Coast Telecasting Company, Inc." ("Gold Coast"), in October, 1968. During the same month, Lucille Frostman, who had been active in the efforts to set up the television station, resigned from the board of directors and disposed of her Gold Coast stock. Gold Coast's certified balance sheet dated October 24, 1968, reflected, as of September 30, 1968, a shareholders' equity of $396,940 with assets totalling $1,072,936.98 and aggregate liabilities of $675,996.98. The assets listed therein included preliminary operating expenses of $113,329.19 and station design and construction permit costs totalling $57,725.62, which were capitalized on the assumption that they could be amortized over five years against anticipated operating revenues. A cash flow projection, prepared by the corporation's accountants for the 12 months beginning October 1, 1968, predicted a deficit of $264,600 for the *319 12 months, assuming no payments on existing indebtedness to Singer's law firm. [2] To raise funds to cover this deficit and an estimated deficit of $20,000 per month for an additional six months the shareholders were asked to subscribe to the remaining 183,500 shares of Class A common stock at $2.10 per share. By November 15, 1968, the shares were fully subscribed, with payment to be made in 14 monthly installments. Delays in shipment of the RCA equipment, faulty design of the broadcasting tower, increases in time required for engineering tasks and studio remodeling, and the effects of a hurricane prevented the station from "going on the air" until December 6, 1968. To ascertain the impact of these difficulties, Gold Coast requested a second cash flow projection, this time for the 12 months beginning December 1, 1968. The report of the accountants dated December 15, 1968, estimated that the cash flow deficit for that period would be $380,000. To ease the immediate cash flow problem a $60,000, 60-day loan bearing interest at 6-3/4 percent was obtained from the American National Bank and Trust Company *320 of Fort Lauderdale. After commencing to broadcast Gold Coast encountered numerous difficulties touching all phases of its operations. The Fort Lauderdale News, the area's major newspaper and one of the station's prime competitors for advertising, directed its employees not to cooperate with the station. As a result the paper did not publish the station's program schedules until July or August of 1969. Nor was the station able to have its schedule published in either the Miami or Palm Beach newspapers, or T.V. Guide. Although Gold Coast operated the only television station in Broward County, that area was also served by five VHF and two UHF stations in Miami and two VHF stations in Palm Beach. A major technical problem that interferred with the station's operation was the breakdown of the multiplexer (an electronic link between the transmitter and antenna) which interrupted signal transmission until repaired. The problem was compounded by the fact that the station's studio was in Fort Lauderdale, while its antenna and transmission facilities were located some distance away in Pembroke Park. Programs were relayed from the studio to the transmitter on microwave equipment. Before the *321 FCC granted the station remote control authority to operate the transmitter from the studio, an engineer had to be kept on duty at the transmitter, with the consequence that the interruption in transmission caused by the multiplexer failure would last only about 30 minutes. But when the station later switched to remote control with the FCC's permission, the duration of these interruptions increased to as much as six hours. As a result, the station rarely achieved the minimum operating efficiency standards set by the FCC. Operating efficiency was also impaired by an initial error in installing the directional transmission antenna. Until the error was corrected, a major advertiser and some stockholders of the company could not receive the station's broadcasts in their homes. Transmission quality also suffered from occasional problems with the microwave relay between the studio and transmitter. During the first three months of 1969 air time sales totalled $57,224.25, compared to the $86,000 projected. To ease its cash problems, Gold Coast launched an economy drive in April, 1969, which included nonrenewal of its contract with a public relations firm, discontinuance of local, live *322 news, and the elimination of much of its news department. However, two new stockholders purchased a total of 4,000 shares of Class A common stock at $5 per share, and by this time petitioner Gray, a business associate and client of Singer, had subscribed to and paid for 30,000 shares of Class A stock, also at $5 per share. In April of 1969, the monthly payments due RCA were suspended. Only two interest payments totalling $6,891.40 had theretofore been made to RCA under the conditional sales contract. The refusal to make further payments was due, at least in large part, to dissatisfaction with RCA and the defective character of equipment supplied by it. No further payments were ever made. Hoping to increase air time sales a new sales agent was hired, but then fired when his high pressure tactics produced disgruntled customers. The inexperienced production and technical staff produced commercials of poor quality and made many errors. In June, 1969, Gold Coast fired the station's general manager and hired a new manager; it also employed the president and general manager of a nearby radio station as advisors. In a memorandum dated June 21, 1969, one of the new advisors criticized the *323 station's lack of staff ogranization, poor programming, weak and inefficient production department, and lack of repeat advertising business, and in a subsequent memorandum he characterized the station's output as "a pretty sad performance on the air". Nonetheless, he outlined several changes that had been implemented to improve the situation including training new technicians and securing new one-year advertising contracts. The financial health of Gold Coast worsened. In July, 1969, the $60,000, 60-day, commercial bank loan came due and was renewed only after Singer agreed to guarantee the note. On August 1, 1969, the accountants submitted an interim financial statement for the first three months of 1969 which reflected an operating loss of $184,629.83 in that period. By the end of July the loss had grown to $441,034.46. After having paid 5/14ths of the amount due under their Class A stock subscription agreements the directors (who were also the shareholders) cancelled them, in part because of the refusal of many of them to make further payments, and also because a recapitalization of Gold Coast was contemplated. During the summer of 1969 Gold Coast borrowed a total of $75,000 *324 from Gray and $10,000 from Singer. These loans were unsecured and evidenced by demand notes bearing 8-1/2 percent interest. Unsuccessful attempts were made to raise additional funds by selling a fixed, "non-dilutable" 25 percent equity interest in the corporation for $500,000. In August of 1969, 2,476 shares of Class A common stock were issued to Singer's law firm as partial payment of legal fees, and 685 shares of Class A common stock were issued to the corporation's former manager as payment for office furnishing which he had supplied. On September 5, 1969, Gold Coast was recapitalized. Two million shares of 25" par value common stock were authorized, of which 431,466 were issued in exchange for all the outstanding Class A and common stock on a share for share basis. As a result, Singer received 101,729 shares of the new stock representing his total cash investment of $198,415, and Gray received 30,000 shares representing his investment of $150,000. It was hoped that the elimination of the impairment of capital achieved by reducing the par value of the outstanding stock would attract new investors. Having retained control of the FCC permit for at least three years the shareholders *325 were able in October, 1969, to offer a 51 percent controlling interest in Gold Coast for $500,000 cash plus a commitment to continue financing the operation of the station. A number of persons were solicited, but none of them responded favorably. In the fall of 1969 Singer was advised that the company's broadcasting equipment would be worth much more if sold in situ along with the FCC permit as opposed to a forced sale. The personal guarantee Singer had given RCA when the company purchased this equipment made him particularly sensitive to this asserted difference in value. Interim financial statements as of August 31, 1969, reflected an operating loss for August of $58,850.23, bringing the total for the previous eight months to $499,884.69. A balance sheet prepared by the accountants as of November 30, 1969, indicated shareholders' equity of $49,755.27. Current liabilities were shown as $435,159.88 compared to current assets of only $99,329.03, and of the $1,625,880.99 in total assets listed, $197,973.05 represented preoperating expenses and $64,751.50 station design and construction permit costs which were still being capitalized on the assumption that they could be amortized *326 over several years against future earnings. Gold Coast was not the only independent UHF station incurring substantial losses: 46 out of 48 independent UHF stations reporting financial data for 1968 to the FCC reported losses with 25 experiencing losses of $400,000 or more. For the previous year 35 out of 37 reported losses, and for the following year 43 out of 48. During the latter part of 1969 and early part of 1970 Singer continued to search for additional capital. He and Gray considered investing another $250,000 each in Gold Coast which they hoped to obtain in a proposed secondary offering of part of their stockholdings in Gray Industries, Inc., but the offering was cancelled. Nonetheless, they advanced additional sums to the company, all evidenced, as before, by unsecured, demand notes bearing 8-1/2 percent interest. By the end of 1969 they had advanced the following amounts in this manner: Paris G. Singer
Oscar S. Gray Date
Amount
Date
Amount
8-26-69
$10,000
6-11-69
$ 25,000
10-9-69
25,000
7-15-69
25,000
10-23-69
10,000
8-7-69
25,000
11-6-69
10,000
11-6 -69
10,000
11-20-69
15,000
11-20-69
15,000
12-4-69
7,500
12-4-69
7,500
12-11-69
5,000
12-19-69
10,000
$107,500
Total
$92,500
*327 In December of 1969 the station continued to operate, although at a loss. The financial picture was discouraging but Singer did not believe it was hopeless and continued, as he did throughout much of 1970, to search for additional financial assistance for Gold Coast. On or about December 12, 1969, Singer asked Welch, the station's FCC counsel, whether it would be possible for the station to go off the air without losing its permit. In January, 1970, Welch advised him that the FCC would probably grant permission to cease broadcasting for 90 days to enable the station to resolve its financial and technical difficulties. Around January 25, 1970, the board of directors decided to request such permission after giving the station's employees one week of notice. On February 3, 1970, Gold Coast wired the FCC requesting the permission, which was granted two days later. Gold Coast ceased broadcasting on February 6, 1970, and was authorized to remain off the air until May 6, 1970. The January, 1970, employee payroll of approximately $10,000 was met by voluntary loans from shareholders who made the loans because it was right after Christmas and because they wanted to see that the employees *328 were paid. Singer, however, continued to seek financial assistance while advancing additional sums to Gold Coast, $17,000 in the first two months of 1970, and in excess of $130,000 subsequent to February 28, 1970. No financial statement as of the end of 1969 was prepared for Gold Coast because of its failure to pay for earlier services rendered by its accountants, but at some time in the next few months another financial statement emerged from the offices of the accountants, ostensibly at Gold Coast's request, which reflected a deficit in shareholder equity of $80,269.59 as of February 28, 1970, as a result of the operating losses incurred by the corporation in December, January and February. In May of 1970, the directors sought and secured permission to remain off the air for another 90 days. In connection therewith Singer wrote a letter dated May 1, 1970, to the Secretary of the FCC in which he stated that "there are still pending negotiations with others respecting the refinancing of the Company", but that "as of this date no specific written proposal has been received". Around the same time three shareholders, Kelley, Wiggins and Qualmann, set up a voting trust arrangement whereby *329 they could obtain control of Gold Coast. At a shareholders' meeting on May 29, 1970, Singer resigned as president of Gold Coast on condition that the other shareholders would pay for legal counsel of his choice to represent him as a party plaintiff in any legal proceeding brought by the corporation against RCA. New directors and officers were elected. In the following July the new management caused the corporation to file a suit against RCA for $6,250,000, alleging that RCA negligently performed its duties under the conditional sales agreement and failed to properly advise the corporation with respect to the purchase and installation of the equipment. Singer was reelected president of Gold Coast in September, 1970, and promptly caused the suit to be dismissed. In the summer of 1970, the same accountants who prepared Gold Coast's earlier financial statements, prepared a new statement as of December 31, 1969, in connection with the preparation of the individual income tax returns of Singer and Gray. By this time the accountants had already advised the petitioners to claim losses on their 1969 income tax returns with respect to their investments in Gold Coast. On this statement depreciation *330 was calculated on the basis of shorter useful lives and an accelerated schedule of write-offs. Also, the preoperating expenses carried as assets subject to amortization on the earlier statements were written off. The consequence of these and other less significant changes was a deficit in shareholders' equity totalling $379,147.55. The secured creditors repossessed most of Gold Coast's assets, while the remaining unsecured assets were seized by the United States on October 12, 1970, to be applied in partial satisfaction of the corporation's liability for unpaid payroll taxes. The balance was ultimately paid by Singer as a responsible officer. Despite the fact that no other creditors were paid after Gold Coast ceased broadcasting, the corporation managed to retain possession of its FCC permit by continually requesting and receiving permission to remain off the air for additional 90-day periods. In his letter to the Secretary of the FCC dated November 2, 1970, in which he sought an additional 90-day extension from November 6, 1970, Singer stated I expect very shortly to reach mutually satisfactory agreements with RCA at which time I have, hopefully, several sources of additional *331 financing which would then permit the rehabilitation and commencement of broadcast operations of and by the company. On December 4, 1970, RCA filed suit against Gold Coast on its conditional sales agreement and against Singer on his $350,000 guarantee, in response to which a counterclaim was filed for $5.6 million in damages by Singer and Gold Coast. The dispute was initially settled by an agreement that was placed in escrow on September 14, 1971, pending necessary FCC approval. Pursuant to the agreement Singer undertook to purchase the Gold Coast equipment with modifications, which he in turn leased to a new corporation in which he had a 12 percent stock interest and to which Gold Coast assigned its FCC permit. The net cost to Singer (i.e., the difference between the cost of the equipment to him and the rentals payable to him under the lease), would have been $307,000 paid over six years; however, no payments were ever made to Singer or by Singer under the agreement. In January, 1974, the parties executed reciprocal releases. The total amount of paid-in capital paid by all the shareholders of Gold Coast was $742,725.35, and no part thereof was ever returned to any of the shareholders. *332 Neither Singer nor Gray ever received any interest or principal payments on their demand notes. At no time did Gold Coast enter into bankruptcy or receivership, nor did the shareholders or directors approve a plan of complete or partial liquidation. The failure of Gold Coast was a major contributing factor to the termination of Singer's professional association with Andrews, Singer and Kilby in July of 1971. On their 1969 joint income tax return Singer and his wife reported a long-term capital loss of $198,415 with respect to their stock in Gold Coast and a $92,500 short-term loss with respect to the advances they made to it during the latter half of 1969. The Singers later filed an amended income tax return for 1969 on which they claimed the $92,500 as a deduction against ordinary income rather than a capital loss. In his deficiency notice, the Commissioner disallowed the longterm capital loss stating that: It is determined that the amount of $198,415.00 claimed as a long-term capital loss from worthless stock in Gold Coast Telecasting Co., Inc. is not allowable because it has not been established that the stock became worthless in the taxable year 1969. With respect to the *333 $92,500 item the Commissioner determined that: [The] amount of $92,500.00, claimed as a shortterm capital loss on your original return, resulting from the transfer of funds to Gold Coast Telecasting Co., Inc. is not allowable because it has not been established that the debt became worthless in the taxable year 1969. Furthermore, if it is found that this debt was worthless in tax year 1969, it is determined that the debt was a nonbusiness bad debt rather than a business bad debt as claimed on Schedule C of your amended return since this was a personal loan and was not created in connection with your trade or business. On their 1969 joint income tax return, petitioner Gray and his wife claimed a long-term capital loss of $150,000 with respect to their stock in Gold Coast, and a short-term capital loss of $107,500 resulting from funds they advanced to it during the second half of 1969. The Commissioner disallowed these deductions in his deficiency notice, explaiming that: (a)(1) It is determined that the amount of $107,500.00 claimed as a short-term capital loss resulting from the transfer of funds to Gold Coast Telecasting Co., Inc. is not allowable because it has not been established *334 that the debt became worthless in the taxable year 1969. (a)(2) It is determined that the amount of $150,000.00 claimed as a long-term capital loss from worthless stock in Gold Coast Telecasting Co., Inc. is not allowable because it has not been established that the stock became worthless in the taxable year 1969. Legal Fees. In August of 1962, Singer owned stock in Airlift International ("Airlift"), a certified air cargo carrier (then known as Riddle Airlines), which was in dire financial straits. Hoping to turn the company around, some of Airlift's shareholders including Singer formed a stockholders' committee and elected James Franklin president of the corporation. Early in 1963, Singer was elected a director. Franklin's control over Airlift was assured by voting trust agreements pursuant to which the shares owned by two of the largest stockholders, Robert M. Hewitt, his predecessor, and William R. Price, and by General Dynamics were placed in a voting trust, with Franklin as trustee. In October, 1964, James H. Price, brother of William R. Price, and a substantial Airlift stockholder, was in need of cash and offered to sell Franklin some of his stock. An agreement was *335 reached whereby Franklin purchased from him 125,000 shares for $34,000, on the condition that he agree to place all of his stock in a voting trust with Franklin as voting trustee. At that time James H. Price owned a little more than one million of the nearly fourteen million shares of Airlift stock outstanding. Under the sale and voting trust agreements as executed, Price had the option to repurchase the 125,000 shares for the contract price plus interest. Among other things, the sale agreement also provided that Price would not appear in person or by proxy, in any capacity, at the Airlift shareholders' meeting to be held late in 1965, nor in any way interfere with or bother Airlift's management in the conduct of its affairs. Price also agreed not to file or encourage others to file any suits, stockholders', derivative or otherwise, against Airlift, its directors, officers, employees, consultants or advisers, including counsel, in connection with any aspect of Airlift's management, operation or financing. The duration of the voting trust was specified by the following provision: This [Voting Trust] Agreement is irrevocable and subject to the other terms hereof shall continue *336 in effect until one week after completion of the 1965 annual stockholders' meeting of Airlift subject to extension as provided for in that certain Agreement of even date between the parties hereto, but in no event shall this voting trust continue for longer than ten years. * * * In turn, the stock purchase agreement provided that: In the event of any default and any resultant litigation, the life of this Agreement and of the Voting Trust Agreement shall automatically extend until final resolution of said default and litigation, except that in no event shall the Voting Trust continue for longer than one (1) day less then ten (10) years from the date of execution and delivery hereof. Singer acted as Franklin's counsel during the negotiation of these agreements, and they agreed to split the 125,000 shares between them, each paying $17,000 for 62,500 shares. At that time Singer already owned 181,500 shares of Airlift and was the fifth largest stockholder, after Hewitt, the Prices and Franklin, out of about 10,000 stockholders. Under Franklin's guidance Airlift prospered. Revenues, earnings and ultimately the value of Airlift stock rose considerably. James H. Price sought at one *337 point to exercise his repurchase option, but did not when informed by Franklin that the shares would then have to go into the voting trust. Rather, on January 12, 1966, Price filed suit against Airlift and Franklin seeking to have the sale of stock and voting trust agreements set aside. In addition to the cancellation of the two agreements, the requested relief included damages, court costs and attorneys' fees, and an order directing Airlift to transfer certain shares on its books sold by Price to third parties. Franklin retained counsel at a fixed fee of 20 percent of the 125,000 Airlift shares Price sought to recover. Although not a party to the suit, Singer agreed to reimburse Franklin for one-half of these expenses. At the time the suit was filed the value of the 125,000 shares of Airlift stock had risen substantially. On September 26, 1966, the trial judge dismissed the lawsuit with prejudice and awarded the costs to the defendants. The dismissal was affirmed on appeal by the Florida District Court of Appeals in 1969. In May of 1969, pursuant to their agreement, Singer conveyed 12,500 shares of Airlift stock to Franklin, which represented one-half of the 25,000 share legal *338 fee. The fair market value of those 12,500 shares at that time was $60,937.50, which amount Singer and his wife deducted from gross income on their 1969 income tax return. In his deficiency notice the Commissioner disallowed this deduction stating that: It is determined that legal fees incurred in defending title to Airlift International stock constitute a cost of the property rather than an ordinary deduction as claimed on your amended return, and, as such, are added to the original cost to arrive at a new adjusted basis. Therefore, upon disposition of 12,500 shares of Airlift International stock you realized a long-term capital loss of $2,500.00 as computed below: Original cost of stock
$ 2,500.00
Legal fees incurred
60,937.50
Adjusted basis
$63,437.50
Services received for stock
60,937.50
Loss on exchange
$ 2,500.00 In an amendment to his answer the Commissioner revised his position and asserted that the legal fees of $60,937.50 should be added to Singer's basis for all 62,500 shares involved in the litigation, and therefore, that the basis in the 12,500 shares transferred to Franklin was only $14,687.50, resulting in a capital gain of $46,250 on the *339 exchange. OPINION RAUM, Judge: This case raises the frequently litigated factual question whether stock owned by a taxpayer became worthless in a particular year, thereby entitling him to claim as a capital loss on the last day of that year his investment therein, as provided in section 165 of the Internal Revenue Code of 1954. [3] The taxpayer has the burden of proof on this issue, Boehm v. Commissioner, 326 U.S. 287, 294; Mahler v. Commissioner,119 F. 2d 869, 871 (C.A. 2), and to carry this burden he must establish not only that the stock had value at the beginning of the particular year, but also that by the end of the sam year, the stock had no liquidating value, and there was no "reasonable hope and expectation that it [would] become valuable at some future time". Sterling Morton,38 B.T.A. 1270, 1278, affirmed 112 F. 2d 320 (C.A. 7); Charles W. Steadman, 50 T.C. 369, 376, affirmed 424 F. 2d 1 (C.A. 6), cert. denied 400 U.S. 869.
*340 Petitioners Singer and Gray contend that their Gold Coast stock became worthless in 1969. Respondent does not dispute that the stock had value at the outset of that year, but contends that petitioners have not proven that it became totally worthless by the end of 1969. On the basis of our examination of all of the evidence presented by the parties we agree with respondent. Although we reach no conclusion as to whether the stock had liquidating value as of the end of 1969, [4] we are satisfied that petitioners have failed to prove that there was no reasonable hope or expectation of future value as of that time. Ordinarily, the absence of any reasonably expectable potential value is proven by establishing the occurrence of some identifiable event or events, such as receivership, bankruptcy, liquidation, or the cessation of business, that demonstrate to everyone having an interest in the affairs of the corporation that such hope or expectation is foreclosed. Sterling Morton,supra,38 B.T.A. 1270, 1278; Mahler v. Commissioner,supra,119 F. 2d 869, 872; see Boehm v. Commissioner,supra,326 U.S. 287, 294, and *341 United States v. S.S. White Dental Mfg. Co.,274 U.S. 398. Here the most obvious events of this type, the termination of broadcast operations, the repossession of the secured assets, the seizure by the Federal Government of all of the remaining physical assets, and the transfer of the FCC permit, all took place after 1969. While the reluctance of third parties, including other shareholders, to invest additional funds in Gold Coast in 1969 is indicative of the enterprise's financial troubles, it does not signal the worthlessness of the corporation's stock. According to the petitioners, however, the absence of an identificable event in 1969 is no bar to their claim. They contend that this case is one of those "exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business *342 will result in any profit to its stockholders". Sterling Morton,supra,38 B.T.A. 1270, 1279; see also Charles W. Steadman,supra,50 T.C. 369. In our view of the evidence before us, it is not sufficiently strong to classify this case as one of those "exceptional cases" referred to above. Although the matter may not be completely free from doubt, we think that the scales tip against petitioners and we have found accordingly. Notwithstanding that prospects were poor, we cannot conclude that they were so hopeless at the end of 1969 that only an "incorrigible optimist", United States v. S.S. White Dental Mfg. Co.,supra,274 U.S. 398, 403, would regard the stock as having potential value at that time. The corporation was still broadcasting and continued to do so until February of 1970. We do not find convincing the evidence that the delay in going off the air was due to delay in receiving advice from Welch. If the matter of ceasing operations were seriously desired in December, there would appear to be no reason why the expression of his views could not have been received earlier, and certainly no evidence was presented *343 to explain why the matter was handled at such an apparently leisurely pace. The real explanation suggested by the record is that the corporation had not yet arrived at any such decision in 1969, bearing in mind that loans were being made to the corporation by petitioners as late as December of that year, and by petitioner Singer in particular as late as December 19. While the test of worthlessness is objective all pertinent factors, subjective and objective, must be considered, and in particular, "[the] taxpayer's attitude and conduct are not to be ignored." Boehm v. Commissioner,supra,326 U.S. 287, 293. Singer was not prepared to throw in the towel at the end of 1969. After all, it must be recalled that a deficit was not unanticipated for the first year of operation. Obviously, unexpected technical problems and sales of air time lagging far behind overly optimistic projections had substantially increased the amount of this deficit, but Singer had not completely abandoned his hope that Gold Coast might be turned around, notwithstanding that the situation could hardly be described as encouraging. Indeed, he continued to advance funds to the company and *344 seek new sources of capital. We do not find credible Siger's testimony that the refusal of a Mr. Gerity in the last week of December 1969 to make an investment in the enterprise represented Singer's "last dying gasp" in his efforts to obtain additional outside financing. Rather, the record shows continued efforts in that direction by Singer during 1970. Thus, on May 1, 1970, he wrote in his letter to the Secretary of the FCC that "there are still pending negotiations with others respecting the re-financing of the Company", although noting at the same time that "as of this date no specific written proposal has been received". And in a similar letter dated November 2, 1970, he wrote that he expected "very shortly" to reach mutually satisfactory agreements with RCA "at which time I have, hopefully, several sources of additional financing which would then permit the rehabilitation and commencement of the broadcast operations of and by the company". In his testimony before us he attempted to characterize those statements as having been couched in "weasel" language. We reject any such cynical explanation. As further evidence that the Gold Coast stock had potential value as of the end *345 of 1969, we note that Singer made loans of $17,000 to the corporation during the first two months of 1970, and further loans in excess of $130,000 thereafter. And we do not accept as credible an explanation that such loans were made solely to stave off his liabilities on the $350,000 RCA guarantee, the $60,000 bank loan, and some $50,000 in payroll taxes. While this may have been a factor, and perhaps an important one, it is our judgment on the entire record that he was also interested in preserving his investment in the enterprise with the hope of realizing something in respect thereof in the long run. Therefore, we hold that respondent properly disallowed the losses that petitioners claimed they incurred in 1969 with respect to their investment in Gold Coast stock. Bad Debt Deduction.As in the case of worthless stock, to substantiate their claims to losses or deductions in 1969 with respect to the funds that they advanced to Gold Coast, petitioners must prove that events occurred prior to the beginning of 1970, which establish that there was no reasonable prospect of recovery thereafter of any part of these debts owed to them by Gold Coast. [5] Section 166; [6]United States v. S.S. White Dental Mfg. Co.,supra,274 U.S. 398; *346 W. A. Dallmeyer,14 T.C. 1282, 1291-2. Petitioners contend that on December 31, 1969, Gold Coast's liabilities exceeded its assets to such an extent as to preclude any prospect of recovery of any part of the debts owed to them. But as we have already indicated, they have failed to prove to what extent the corporation was insolvent if at all. Furthermore, "[evidence] of insolvency based on book figures does not necessarily establish the worthlessness of debts", particularly where the corporation is continuing to actively engage in its business, as Gold Coast was throughout 1969. Trinco Industries, Inc.,22 T.C. 959, 965. *347 Nor should we overlook the fact that Singer and Gray did not expect immediate repayment of their debts. Although the advances were evidenced by demand notes, they were recerded as long-term liabilities on Gold Coast's books. And in light of the financial difficulties Gold Coast was experiencing in its first year of broadcasting it must have been apparent to them that the repayment of these unsecured obligations depended entirely on the prospect of future profits, the disappearance of which has not been shown to have occurred in 1969, as we have already observed. Indeed, Singer's additional advances in 1970 are somewhat inconsistent with his claim that those made in 1969 were by that time already worthless. Cf. Richard R. Riss, Sr.,56 T.C. 388, 410, remanded on another issue 478 F. 2d 1160 (C.A. 8), affirmed sub nom Transport Mfg. & Equip. Co.,478 F. 2d 731 (C.A. 8). Since petitioners have not established the total worth-lessness of these debts in 1969 we hold that respondent correctly disallowed the bad debt deductions claimed by petitioners, and we need not consider the question whether Singer's advances were created in connection *348 with his trade or business, the practice of law, thereby entitling him to a deduction from ordinary income rather than a capital loss. Legal Expenses. It is not disputed that the proper tax treatment to be afforded litigation expenses must be ascertained by reference to the underlying claim. See Woodward v. Commissioner,397 U.S. 572; United States v. Gilmore,372 U.S. 39; Spangler v. Commissioner,323 F. 2d 913 (C.A. 9); GeorgeEisler,59 T.C. 634; Stass Reed,55 T.C. 32. And if the costs are incurred in defending or perfecting the taxpayer's claim to ownership of capital assets, they must be capitalized rather than deducted from ordinary income. Secs. 1.212-1(k) and 1.263(a)-2(c), Income Tax Regulations; Spangler v. Commissioner,supra, at p. 918; George Eisler,supra;Stass Reed,supra.At the heart of the dispute in this case is the proper application of these principles to the litigation between James H. Price and Franklin, part of the cost of which was borne by petitioner Singer. Singer characterizes the *349 litigation as a dispute over the validity of the voting trust agreement under which Franklin obtained the right to vote all of Price's stock. Thus, argues Singer, what was at stake was the ability of the new management represented by Franklin and his allies to maintain control over Airlift and protect the prosperity the company had enjoyed since their takeover. Since the expense was, in his view, incurred to maintain or conserve the value of his Airlift stock, it should be deductible under section 212 of the Code, which allows a deduction for expenses paid "* * * (2) for the management, conservation, or maintenance of property held for the production of income * * *". Respondent takes a different view of the Price-Franklin litigation. He asserts that since Price sought to rescind the two agreements with Franklin, the latter's purchase of 125,000 shares of Airlift for $34,000, which he had split with Singer, was in jeopardy. Since Franklin and Singer stood to lose title to these shares, the litigation expense was, in respondent's opinion, incurred by Singer to defend or protect title to his half of the 125,000 shares, and must be capitalized by being added to his basis in those shares. *350 To some extent both parties are correct. Although Price did have an option under the agreements to repurchase the 125,000 shares for $34,000, that option expired on November 25, 1965, prior to his filing suit against Franklin. Therefore, by the time the litigation was under way Franklin and Singer were secure in the knowledge that they would enjoy the substantial appreciation in value of those shares unless the sale itself were rescinded, and accordingly, the cost of defending the acquisition of these shares must be capitalized. At the same time the litigation also placed in jeopardy the voting trust agreement, which Price sought to have declared invalid. By securing for Franklin voting control over a large block of shares and prohibiting Price from attempting to influence or challenge actions taken by Airlift's stockholders or management, this agreement strengthened the ability of Franklin and his associates to control Airlift, and, in their view, disarmed another dissident who might interfere with their continuing efforts to revitalize the corporation or jeopardize their past progress in this regard. An expense paid for such a purpose would fall within section 212(2), since it *351 would plainly have been incurred for the purpose of conserving or protecting the income-producing potential of the stock in question. Accordingly, to the extent that the expense in question was incurred for this purpose it was deductible under section 212(2) and need not be capitalized. In our view of the evidence before us, the attorney's fee was paid for a dual purpose: one, to defend the acquisition and ownership of the shares, and the other, to conserve the income-producing level and prospects of those shares. The portion of the fee paid for the first purpose was not deductible, but the remaining portion paid for the second purpose was deductible. However, since there was no breakdown of that fee, and since the two matters remained intertwined throughout the course of the litigation, it is necessary that we make an allocation. George Eisler,supra,59 T.C. at p. 641. Bearing in mind that both aspects played important and substantial roles, it is our best judgment and we hereby find as a fact that one-half of the legal costs incurred by Singer is attributable to an expense that is deductible under section 212, and the other half to the defense of title to *352 his half of the 125,000 shares in dispute. The latter portion must be capitalized and added to Singer's basis in his 62,500 shares. Decision will be entered under Rule 155 in Dt. #8575-72.
Decision will be entered for the respondent in Dt. #8576-72.
Footnotes
1. Originally, the amount billed in 1968 totalled $26,505.09, but that amount was reduced by an adjustment in January, 1969.↩
2. The accountants were advised that payment of these expenses could be deferred.↩
3. SEC. 165. LOSSES * * * * *
(g) Worthless Securities.-- (1) General Rule.--If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. * * * * *↩
4. We had but little confidence in the various unverified financial statements placed in evidence purporting to reflect the condition of the corporation as of November 30, 1969, December 31, 1969, and February 28, 1970.↩
5. Singer contends that if the debts became wholly worthless in 1969 he is entitled to a deduction from ordinary income rather than a capital loss because the debts were not "nonbusiness debts". Deductions for partial worthlessness can be taken with respect to business related debts; however, Singer has neither claimed nor established the basis for a deduction on account of partial worthlessness. ↩
6. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * * * (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩