ALEXANDER E. SHVETZ and EDA SHVETZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shvetz v. Commissioner
Docket No. 7167-75.
United States Tax Court
T.C. Memo 1979-298; 1979 Tax Ct. Memo LEXIS 227; 38 T.C.M. (CCH) 1163; T.C.M. (RIA) 79298; August 7, 1979, Filed *227 Held, Ps are entitled to carryover to 1969 a long-term capital loss because they have carried their burden of proving: (1) That they purchased 8 parcels of property in Shanghai, China, between 1942 and 1945; (2) how much they paid for 6 of such properties; (3) that they retained ownership and control of such properties at the time they contributed them to X Corp. in 1948; and (4) that their stock in X Corp. did not become worthless in 1954. Guy B. Maxfield and Gilbert T. Perlman, for the petitioners. H. Stephen Kesselman and Ellis L. Reemer, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $109,690.00 in the petitioners' 1969 Federal income tax. The parties have settled some of the issues. The issue remaining for decision is whether the petitioners are entitled to carryover a long-term capital loss to 1969 resulting from the worthlessness of certain stock. Resolution of such issue depends on (1) whether the petitioners have carried their burden of proving that Mr. Shvetz owned eight parcels of real estate in Shanghai, China; (2) whether the *229 petitioners have carried their burden of proving how much Mr. Shvetz paid for the Shanghai real estate; (3) whether the petitioners have carried their burden of proving that Mr. Shvetz had control and ownership of the Shanghai real estate at the time he transferred it to the Shvetz Realty Corporation in 1948; and (4) whether the petitioners have established that Mr. Shvetz' stock in Shvetz Realty Corporation was not worthless in 1954. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Alexander E. Shvetz and Eda Shvetz, husband and wife, resided in New York, N. Y., at the time they filed their petition in this case. They filed their joint Federal income tax return for 1969 with the District Director of Internal Revenue, Manhattan, N.Y. Mr. Shvetz will sometimes be referred to as the petitioner.
The petitioner was born in 1913 in Nikolaev, Russia. In 1930, he immigrated to China with his family. He remained in China for 2 years, attending business and Oriental language school. In 1932, the petitioner moved to Kobe, Japan, and he commenced the operation of an import-export business with members of his family and others. *230 In the late 1930s, the petitioner opened business offices in Shanghai, China, and in the Philippines. Prior to the outbreak of World War II, the petitioner's business ventures were vey successful. In anticipation of World War II, the petitioner moved to Shanghai. With the Japanese occupation of China, he decided to liquidate his business inventory and to invest the proceeds therefrom, along with other funds accumulated over the years, in real estate in Shanghai. He was concerned that the Japanese might confiscate personal property useful in the war effort, but he was confident that they would not confiscate real estate and that they could not take it with them when they left. Accordingly, from 1942 to 1945, the petitioner purchased real estate in Shanghai (Shanghai properties). In 1943, he purchased the Sieyes Apartment, Number 338 Route Tenant de la Tour (Sieyes Apartment), a corner apartment building located at the intersection of Route Tenant de la Tour and Rue de Sieyes, for a purchase price of $155,000. The apartment building was located in a good residential area of the French section of Shanghai known as the French Concession.
From the latter part of 1942 through *231 1945, the petitioner purchased shops and residences at Numbers 82-94 Route Tenant de la Tour, and he purchased contiguous land with two residences described as Lane 100 Saing Yang Road. The petitioner acquired these properties in eight or nine separate transactions. All of such properties were located in the French Concession, and they were approximately 3 mows in size (a mow is a Chinese measurement which is slightly less than one-sixth of an acre). The petitioner paid an aggregate purchase price of $150,000 for such properties. In 1943, the petitioner also purchased a garden apartment complex known as Number 631 Kwenming Road. Such complex consisted of 40 two-story red brick houses, several of which fronted on Kwenming Road and were used for commercial purposes. The complex comprised 6-1/2 mows, and the petitioner paid a purchase price of $175,000. In 1944, the petitioner, in partnership with another, purchased approximately 20 mows of unimproved land known as the Pearce Road property and the Chinazu Station property for a total purchase price of $85,000. By 1947, the petitioner was the sole owner of these properties, having purchased his partner's one-third interest *232 in them for approximately $28,000-$29,000. In 1944, the petitioner purchased another tract of unimproved land, 4-1/2 mows in size, known as the Woo Tah Road property. The petitioner could not remember how much he paid for such property. In 1944, the petitioner purchased 1-4/10 mows of unimproved land in Chapei, a residential area in the northeastern part of Shanghai. Such property was known as the Point Road property. The petitioner could not recall how much he paid for such land. All the Shanghai properties were purchased by the petitioner without any mortgages. He used previously accumulated funds to finance such purchases. In addition, during the period of the Japanese occupation of China, it was customary to pay the purchase price for real estate with gold bars. Such bars weighed 10 ounces and were valued in terms of United States dollars. From 1942 to 1945, the gold bars were valued at $850 a bar, and the purchase price of real estate was generally translated into U.S. dollars. The petitioner purchased some of the Shanghai properties with gold bars. After the conclusion of World War II, the petitioner and his partners once again began operating the import-export *233 business. Within a few months after the war, they began shipping furs and bristles to the U.S. The petitioner traveled to the U.S. in December 1945 in connection with such business. He returned to Shanghai in early 1946 to attend his father's funeral, and in the summer of 1946, he returned to the U.S. with his family. Since that year, the petitioner has made his residence in the U.S. and has become a citizen of the U.S. During his absence from China from 1945 to 1948, his partners in his import-export business operated the business in the Orient, and a real estate brokerage firm managed his real estate holdings in Shanghai. After World War II, life in Shanghai normalized quickly, and within a relatively short period of time, it was business as usual. Economic and political conditions remained stable from 1945 through 1948, and when the petitioner left Shanghai in 1946, he did not fear for his safety. The Communists did not assume control of Shanghai until May 1949. During the 1940s, the Chinese currency experienced rapid devaluations on the international monetary markets. The following chart summarizes the value of one Shanghai dollar in terms of U.S. currency on the *234 dates indicated: Date
Value
Jan. 2, 1940
$.076233
July 1, 1941
.053625
No rate from Aug. 1941 -
March 1946
April 1, 1946
.000526
June 1, 1948
.0000022
June 8, 1948
.00000115
June 10, 1948
.00000110
June 23, 1948
.000000702
June 30, 1948
.000000445
July 7, 1948
.000000420
On June 10, 1948, the petitioner incorporated Shvetz Realty Corporation in the State of Delaware (Realty). One hundred shares of Realty were issued, seventy-six of which were issued to the petitioner, two of which were issued to the petitioner's brother as nominee for the petitioner, and twenty-two of which were issued to two individuals for services to be performed as officers of the corporation. On June 24, 1948, the first board of directors meeting of Realty was held in Shanghai, China. On such date, the petitioner transferred the Shanghai properties to Realty. The properties had been valued in U.S. dollars at a fair market value of $198,125, and they were carried on Realty's books and records and Federal corporate income tax returns from 1948 through 1953 at such amount. Realty had no other assets from 1948 to 1954. On March 29, 1950, Proclamation of the People's Government *235 of Shanghai No. 02278 placed all real property within the City of Shanghai, which was not in the possession of its owner, under the control of the Bureau of Real Property of the People's Government of Shanghai for the purpose of protecting the property and preventing it from being wrongfully occupied, misappropriated, or damaged by others. On December 28, 1950, a proclamation was issued by the Premier of Communist China forbidding the transfer or other disposition of property owned by "the American Government and American enterprises." Local governments were instructed to inventory such property. In addition, "All American public and private deposits" were frozen. The Shanghai Military Control Commission issued Proclamation No. 38 on December 31, 1950, implementing such order. Under the Proclamation of the People's Government of Shanghai No. 2888 issued August 11, 1951, and the People's Government of Shanghai, Bureau of Real Property, Public Notice No. 7069 issued November 13, 1951, if aliens did not register their real property with the Bureau of Real Property by November 30, 1951, such property was to "be taken over by and placed under the custody and control of the government. *236 " On its 1954 corporate Federal income tax return, Realty claimed that the Shanghai properties had become worthless because they had been expropriated by the Chinese government, and therefore, it deducted $198,125 as a long-term capital loss. Such loss was allowed on audit by the Internal Revenue Service. On its 1955 and 1956 corporate Federal income tax returns, Realty reported no income, no assets, and no liabilities. However, it had a capital loss carryover of $198,125. In 1955, Realty cancelled the 22 shares of its stock which were issued to two prospective officers because such individuals never became officers of Realty and never performed any services for the corporation. In addition, in 1956, the two shares which had been issued to the petitioner's brother were transferred to the petitioner. As a consequence, by November 1956, the petitioner was the sole shareholder of Realty. From 1955 through 1957, Realty was actively seeking investments and business opportunities. The petitioner, acting on behalf of Realty, engaged in preliminary discussions and more detailed negotiations on several occasions with prospective investors or in connection with potential business *237 transactions. However, no deals were actually consummated until 1957 when Realty borrowed money and purchased real estate in Detroit, Mich. From 1957 to 1965, Realty managed such property, and it reported on its annual tax returns whatever income and expenses such property generated each year. On December 27, 1965, Realty was dissolved. Upon dissolution, the petitioner, who was Realty's sole shareholder at such time, received the corporation's assets, including Realty's right to any future reimbursement based upon the expropriation of the Shanghai properties. The petitioner did not claim any loss on his 1965 Federal income tax return in connection with his Realty stock (the stock) or the dissolution. On their 1968 joint Federal income tax return, the petitioners claimed a long-term capital loss of $550,000 based on the worthlessness of the stock. Such loss was carried over to their 1969 joint Federal income tax return. On or about July 7, 1969, Realty filed a claim with the Foreign Claims Settlement Commission of the United States (Commission). In such claim, the petitioner claimed a loss of $450,000 based on the confiscation of the Shanghai properties. He alleged that *238 such properties had been purchased by him between 1939 and 1944 for a purchase price in excess of $450,000. The Commission's amended final decision issued on June 30, 1972, found that Realty had been the owner of "Lane Number 100 off Saing Yang Road South, Shanghai, China," and that such property had been taken in 1957 at a time when the petitioner had been a national of the United States. The Commission determined that the value of the property at the time of the taking was $80,000. As to the remaining Shanghai properties, the Commission concluded that the corporation had failed to carry its burden of proving "that the other items of property were taken at a time when they were owned by a national or nationals of the United States." In his notice of deficiency, the Commissioner disallowed the capital loss carryover from 1968 to 1969 because the petitioners had not established to his satisfaction that the stock became worthless in 1968 and because they had not established their basis in the stock. The parties have agreed that if the stock became worthless in 1965, then the petitioners were entitled to a long-term capital loss carryover in 1968 reduced by $6,064.74. OPINION
*239 The issue for decision is whether the petitioners are entitled to carryover a long-term capital loss to 1969 resulting from their stock becoming worthless. In denying such carryover, the Commissioner takes the position that to be entitled to such deduction, the petitioners must prove: (1) That Mr. Shvetz purchased the Shanghai properties; (2) how much he paid for them; (3) that he retained adequate ownership and control of the Shanghai properties at the time he transferred them to Realty; and (4) that the stock did not become worthless between 1954 and 1956. [1] Though we agree with the Commissioner that the petitioners must establish each of such factors to be entitled to the deduction, we agree with the petitioners that, as a factual matter, they have carried such burden. *240 To establish that Mr. Shvetz purchased the Shanghai properties and how much he paid for them, the petitioners presented the testimony of Mr. Shvetz. He explained that he purchased the properties from 1942 to 1945, and that he paid $565,000 for six of them. He provided us with a detailed explanation of how real estate transactions were conducted in Shanghai, and how the purchase price of real estate was determined. His decision to buy real estate to protect himself and his assets from the Japanese certainly appears to be a reasonable explanation for investing in real estate at that time.His testimony to the effect that real estate was going for a premium because many businessmen recognized it as one asset the Japanese could not take with them, certainly is plausible under the circumstances. For the most part, we found the testimony of the petitioner to be believable and credible. The petitioners corroborated the testimony of Mr. Shvetz in several ways. First, they produced several deeds and declarations of trust evidencing Mr. Shvetz' ownership of the Shanghai properties. The minutes of the first board of directors meeting recite that the Shanghai properties were contributed *241 to Realty, and in every document filed with the IRS and the Commission in which the petitioner listed the real estate he owned in Shanghai, he consistently listed all the Shanghai properties. In addition, the petitioners also offered the testimony of Joseph J. Ganger and Michael E. Kaptzan. Mr. Ganger, who eventually became a business associate of the petitioner, was a dealer or broker in gold bars and foreign currencies in Shanghai during World War II. He testified that on several occasions, Mr. Shvetz purchased gold bars from him to purchase some of the Shanghai properties. He also confirmed that Mr. Shvetz owned the Kwenming Road property and the Sieyes Apartment. Mr. Kaptzan, a former business associate of Mr. Shvetz, corroborated that Mr. Shvetz paid $85,000 to $90,000 for the Pearce Road property, and that Mr. Shvetz purchased the Lane 100, 82-94 Tenant de la Tour, and 631 Kwenming Road properties. Finally, the petitioners presented the testimony of Norwood F. Allman to establish the approximate fair market values of the Shanghai properties at or around the time Mr. Shvetz purchased them. Mr. Allman is an attorneywho lived in Shanghai and dealt in real property transactions *242 in one capacity or another from before 1920 to 1950, except for 3 years during World War II when he was in the U.S. From 1920 to 1924, he was in charge of the Land Office of the American Consulate General in Shanghai and sat on the International Mixed Claims Court. During such 4-year period, he issued several thousand U.S. Consulate deeds to U.S. citizens. From 1924 to 1942, he was engaged in the private practice of law in Shanghai, and one of his clients was a major real estate company. During the course of representing such client, as well as others, he became very familiar with the real estate market in Shanghai. In addition, he owned his own house in Shanghai, and he was very familiar with some of the properties purchased by Mr. Shvetz. At the beginning of World War II, Judge Allman was interned by the Japanese for awhile, but eventually he was involved in a prisoner exchange with the U.S. Upon his return to the U.S. in 1942, he joined the Office of Strategic Services, and he was appointed the Chief of the Far Eastern Intelligence Service. In such capacity, he developed a highly sophisticated intelligence organization in China, and through such organization, he was very familiar *243 with the economic and business conditions in China. After World War II, he returned to Shanghai and continued to practice law until 1950. Based on his knowledge of real estate transactions and values in Shanghai, Judge Allman determined the Shanghai properties had a cumulative fair market value at the time the petitioner purchased them of around $700,000. Though such estimates of fair market value exceed the actual prices paid by the petitioner, Judge Allman's opinion as to the value of the Shanghai properties is very persuasive evidence that the petitioner did in fact pay what he claimed he paid for such properties. Despite all of this evidence, the Commissioner argues that the petitioners have not proven that Mr. Shvetz owned the Shanghai properties, or if he did own them, how much he paid for them.In support of his position, the Commissioner relies primarily on a number of inconsistencies in the petitioners' evidence, claiming that such inconsistencies make all of the petitioners' evidence suspect. Quite frankly, we are also somewhat troubled by some of the inconsistencies. For example, some of the petitioner's prior written statements to the Commission and to the IRS relating *244 to the dates he purchased some of the Shanghai properties and to their purchase prices are not completely in line with his testimony at the trial, and he claimed a loss of only $450,000 on the claim he filed with the Commission. In addition, we are particularly bothered by the fact that the Shanghai properties were valued in 1948 by a real estate firm in Shanghai at only $198,125. Yet, the petitioners offered satisfactory explanations of most of such inconsistencies. For example, the $450,000 loss he filed with the Commission was based on the fair market value of the properties at the time of the loss, and not his cost in purchasing them. Moreover, the 1948 valuation of the Shanghai properties apparently relates to their assessed values, and if such properties were valued in Chinese currency and then converted to U.S. dollars, the rapid devaluation of the Chinese currency during 1948 could explain the comparatively low fair market value. But probably the most persuasive explanation of many of the inconsistencies is that the events in issue occurred nearly 40 years ago, and in the process of jogging memories to reconstruct the transactions, the petitioner's recollections have not *245 been wholly consistent. Moreover, despite the inconsistencies, all of the evidence is consistent with Mr. Shvetz' ownership of the Shanphai properties, and the petitioners presented persuasive evidence of how much he paid for the properties. Most importantly, the testimony of Judge Allman, a disinterested third party, fully corroborates that the Shanghai properties were worth approximately what the petitioner claims to have paid for them.Accordingly, on this record, we hold that Mr. Shvetz owned the Shanghai properties, and that his basis in such properties at the time he contributed them to Realty was $565,000. Next, we must decide whether the petitioner had effective ownership and control of the Shanghai properties on the date they were transferred to Realty. The Commissioner argues that if the petitioner lost ownership and control of the Shanghai properties prior to transferring them to Realty, he could not have legally transferred title to such properties. Though the Commissioner is obviously right in his statement of the law, the facts in this case persuasively establish that the petitioner had the requisite ownership and control of the Shanghai properties at the time he *246 contributed them to Realty. The evidence establishes that from 1945 through 1948, business in Shanghai proceeded in a relatively normal fashion. Mr. Shvetz, Mr. Ganger, Mr. Kaptzan, and Judge Allman all testified that during such period, Shanghai was just like any other large city and that business was transacted as usual. The petitioner retained a real estate brokerage firm to manage his Shanghai properties and to collect rent. There is absolutely no evidence that, because of the political environment in China, the petitioner either abandoned or lost ownership and control of the Shanghai properties prior to transferring them to Realty. Though the Communist Chinese did assume political control of Shanghai in May 1949, the evidence establishes that the Shanghai properties were not expropriated by such government until sometime after 1951. Accordingly, we hold that the petitioner had the requisite ownership and control of the Shanghai properties when he contributed them to Realty in June 1948. Finally, we must decide when the petitioner's stock in Realty became worthless. The Commissioner argues that such stock was worthless as of the end of 1954, and therefore, the petitioners *247 were not entitled to any worthless security deduction in 1965, 1968, or 1969.The petitioners, on the other hand, apparently argue that the stock became worthless in 1968, and therefore, they are entitled to carry over the long-term capital loss to 1969. Both parties agree that if the stock became worthless in 1965 in connection with the liquidation and dissolution of Realty, then the petitioners are entitled to carryover to 1968 a long-term capital loss reduced by $6,064.74. Based on a careful examination of all of the evidence, we hold that the stock became worthless in 1965 in connection with the liquidation or dissolution of Realty. Section 165(a) of the Internal Revenue Code of 1954 allows a deduction for any loss sustained during the taxable year which is not compensated for by insurance or otherwise. To be allowable as a deduction under section 165(a), a loss must be evidenced by a closed and completed transaction, fixed by identifiable events actually sustained during the taxable year. Sec. 1.165-1(b), Income Tax Regs.Section 165(g)(1) *248 provides that if any security which is a capital asset becomes worthless during a taxable year, the loss resulting therefrom shall be treated as a loss from the sale or exchange of a capital asset on the last day of the taxable year. Section 165(g)(2) defines security to include a share of stock in a corporation. In determining whether stock is worthless, both its current liquidating value as well as its potential future value must be taken into consideration. As we stated in Morton v. Commissioner,38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F. 2d 320(7th Cir. 1940): The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value.If its assets are less than its liabilities but there is a reasonable hope and expectation that *249 the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. [Emphasis added.] See Lincoln v. Commissioner,24 T.C. 669, 694 (1955), affd. per curiam 242 F. 2d 748 (6th Cir. 1957).Ultimately, the issue of when stock becomes worthless is a question of fact to be determined based on all of the facts and circumstances. As stated by the United States Supreme Court in Boehm v. Commissioner,326 U.S. 287, 292-293 (1945): Such an issue of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration regardless of their objective or subjective nature. As this Court said in Lucas v. American Code Co.,280 U.S. 445, 449, "no definite legal test is provided *250 by the statute for the determination of the year in which the loss is to be deducted. The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal test." The standard for determining the year for deduction of a loss is thus a flexible, practical one, varying according to the circumstances of each case. * * * To support his position that the petitioner's stock in Realty became worthless in 1954, the Commissioner emphasizes that Realty had no liquidating value at the close of 1954. He points out that Realty deducted as worthless on its 1954 corporate Federal income tax return its only asset, the Shanghai properties; that from 1954 to 1956, Realty did not earn income; and that in such period, Realty reported no assets and liabilities. While such factors certainly do indicate that Realty had little or no liquidating value, we think the petitioners have successfully carried their burden of showing that several factors combined to create potential value for the stock from 1954 to 1957, and actual value from 1957 to 1965. From 1954 through 1957, Realty was an active real estate development corporation.Through Mr. Shvetz, *251 Realty was actively investigating potential investment opportunities and conducting negotiations with numerous potential investors. Part of the motivation for such activity was the nearly $200,000 capital loss carryover which was available to Realty because of the worthlessness of the Shanghai properties. Such efforts eventually culminated with Realty borrowing funds and purchasing real estate in Detroit, Mich., in 1957. Also, Realty had the prospect, however unlikely, that it might receive some reimbursement from the Chinese or U.S. Government for its loss. The corporation continued to function between 1954 and 1956, calling several directors meetings and adjusting its capital structure to reflect that Mr. Shvetz was the sole shareholder. In addition, Mr. Shvetz apparently supplied Realty with funds to pay its State franchise taxes and other minor operating expenses during this period. When all of such facts are taken into consideration, it is clear that there was "a reasonable hope and expectation" that Realty's assets would exceed its liabilities in the future. Therefore, the stock was not worthless in 1954. In 1957, Realty invested in real estate in Michigan, and apparently, *252 the Commissioner concedes that the stock had value from 1957 to 1965. Since Realty was liquidated and dissolved in 1965, we hold that the petitioner's stock became worthless sometime during 1965. Decision will be entered under Rule 155. Footnotes
1. The Commissioner apparently concedes that the transfer from the petitioner to Realty in 1948 was a nontaxable transaction; that the dissolution and liquidation of Realty in 1965 was not a sale or exchange of the stock under sec. 331, I.R.C. 1954↩; that the petitioners need not have claimed the loss on their 1965 tax return to be entitled to carry it over to 1968 and 1969; and that the $550,000 loss deducted by the petitioners in 1968 is not the loss on the Shanghai properties distributed to him in connection with the 1965 liquidation. Accordingly, we do not consider, nor do we express any views as to, such issues, and we will confine our opinion to the issues as presented by the parties.